**John ARCENEAUX, Rose Arceneaux and Texas Employers Insurance Association, Appellants,**

v.

**LYKES BROS. STEAMSHIP CO., et al., Appellees.**

**No. 09–93–089 CV.**

Court of Appeals of Texas, Beaumont.

Dissenting Opinion Upon the Overruling of Appellee's Motion for Rehearing filed May 11, 1995.

Richard Schechter, Houston, Woodson E. Dryden, Dryden, Watson, Grossheim & Jamail, Beaumont, for appellant.

Richard E. Hanson, Brown, Sims, Wise & White, Houston, Robert Keith Drummond, P. Michael Jung, Strasburger & Price, Dallas, William M. Tolin, III, Hubert Oxford, III, Benckenstein & Oxford, Beaumont, for appellee.

Appellees Motion for Rehearing Overruled May 11, 1995.

Before WALKER, C.J., and BROOKSHIRE[1] and BURGESS, JJ.

---

the merits" in determining whether appellee's motion was timely.

1. Justice, Retired, Court of Appeals, Beaumont, sitting by assignment pursuant to Tex.Gov't Code Ann. § 74.003(b) (Vernon 1988).

### DISSENTING OPINION UPON THE OVERRULING OF APPELLEE'S MOTION FOR REHEARING

BROOKSHIRE, Justice, dissenting.

Upon reconsideration of the record and controlling precedents and appellee Lykes's motion for a rehearing, this dissent is respectfully filed.

At the threshold, it is significant, if not determinative, to note that the majority opinion recites and concedes that Arceneaux's fall did not take place at the offset part of the ladder. Arceneaux fell from the straight, vertical part of the ladder in the number three hold. Arceneaux was on a straight up and down, vertical part of the so-called "accident ladder". The ladder was at that point a usual type ladder.

On or about January 21, 1985, longshoreman Arceneaux, a fifty-six year old, five foot, seven inches, 220 pound male, had been working as a longshoreman for approximately ten and a half hours in the number three hold of the S.S. (or M/V) Joseph Lykes. Arceneaux had been handling loaded sacks, each weighing approximately 110 pounds or more. The weather was clear but cold. The minimum temperatures were ranging between 20 degrees and 40 degrees Fahrenheit. These were outside temperatures which existed during the ten and a half hour period when longshoreman Arceneaux was working in the ship's hold. The co-workers and co-longshoremen with Arceneaux reported that Arceneaux had experienced some arm pain and cramping and leg cramping. These pains and crampings were apparently secondary to the heavy muscular exertion and muscular fatigue that resulted from the ten and a half hour work day and they occurred toward the end of the work day.

At the end of the day, Arceneaux climbed out of the ship's hold up to the level of the main deck. This climb to the main deck was practically a climb straight up of about 40 feet. Climbing up the 40 feet was a climb past three 'tween deck levels. The climb was made by means of a three section, in-line, fixed, vertical metal ladder. It was reported that Arceneaux appeared to be tired and even exhausted at the end of the difficult,

hard, ten and a half-hour work day. At this point, the outside temperature was about 35 degrees Fahrenheit. Arceneaux was the last longshoreman to climb out of the number three hold. Actually, Arceneaux had climbed almost to the top of the ladder.

However, after almost reaching the top of the ladder, he stopped. His stop, according to the record, was because he felt that he was not then physically capable of climbing all the way to the top without taking a rest. He then took a number of steps back down the ladder apparently to reach a 'tween deck and there to rest. As he was in the process of climbing down toward the 'tween deck, he apparently lost his footing *or* his grip and fell approximately 30 feet down to the bottom of the ship's number three hold.

At the outset, it is important and significant to note that the longshoreman had climbed up the so-called "accident ladder" almost to the top of it, almost reaching the main deck. He had used the ladder successfully to this point and the condition of the ladder was open and obvious to him as he had actually used the same ladder successfully three or four times previously that same day. It was after he was climbing back down to reach a rest place on a 'tween deck that he fell. The so-called "accident ladder" was straight and vertical at the place where Arceneaux fell.

The ladder was fairly described as an open ladder consisting of a vertical in-line ladder approximately 40 feet high. The ladder's construction and features were apparent, open, and obvious. The record fairly reflects that in the opinion of an expert for the plaintiff, the subject ladder was defective in design. At no place in this expert's report is it charged that there was any hidden or latent defect or deficiency in the so-called "accident ladder". The design was clearly open and obvious. A witness, a co-longshoreman to Arceneaux, testified that it was the design of the ladder that was not good.

However, in this sworn statement of Robert Braneff, the witness does not charge that there is anything latent or hidden about the ladder and Braneff avowed he had climbed both up and down the very same type of

ladder hundreds of times without falling. Braneff had been a longshoreman since the early 1960s. He had definitely climbed these exact same types of ladders for many years. Braneff admitted being on the very same type of ladder literally hundreds of times. Mr. Braneff reported no accident or injury during his own experience by using the exact same type of ladder literally hundreds of times beginning in the early 1960s.

In another statement by another witness, one Russell Bertrand, testified that he did not like this type of ladder but it was something that he knew was there and the ladder was obvious and clearly visible to him. Bertrand stated that during the loading operation no crew members of the ship nor any officers of the ship were instructing the longshoremen what to do or how to load or unload. The loading operation was strictly and completely in the hands of the stevedore and the longshoremen.

The longshoremen took orders strictly and solely from their own longshoreman's hierarchy—from their gang foreman and from their walking foreman to the line boss and superintendent. Bertrand affirmatively stated that the choice of ladders was made by the longshoremen and by Mr. Arceneaux and that no crewman of the ship or officer from the vessel made any longshoreman or Mr. Arceneaux use the particular ladder in question. Bertrand also stated that all the other longshoreman were able to use the ladder in question without any problem.

Mr. Arceneaux testified that he went aboard the vessel at about 7:00 a.m. in the morning and the vessel was at the Port of Beaumont with the port side of the vessel next to the dock. The longshoremen were in a loading operation involving flour sacks. Mr. Arceneaux was working in the after end of the number three hold. There was no cargo aboard the vessel that morning so Mr. Arceneaux was loading the lower hold on the after end. Pallets were used to lower the bags of flour into the hold. All the 'tween decks and the 'tween deck levels were open all the way to the main deck.

Nineteen men were working in the hold. Arceneaux went down the hatch and into the hold by the "accident ladder". The plaintiff stated that he fell from the ladder in the number three hatch when he was going out, finally, after the day's work was completed and that the "accident ladder" was the same ladder that he went down when he went to work that morning and it was the same ladder that he used climbing up and climbing out at noon. It was a nice day. No rain.

Arceneaux took a break for lunch from about 12:00 noon until about 1:00 p.m. He left the hold and when he went out for lunch he used the same "accident ladder" that he had gone down in the morning and this was the very same ladder that he later fell off at the end of the day. After he completed lunch he went back down the same ladder. He testified that the rest of the gang got up and down the same ladder for the lunch break. He stated that normal quitting time was at 5:00 p.m.

Arceneaux testified that after 5:00 o'clock that day that "we went back". Necessarily then, Arceneaux used this exact same ladder at least four times or more that same day of January 21, 1985. Necessarily, the so-called "accident ladder" was open and obvious and clearly visible to Arceneaux at least on four occasions that day. Arceneaux has used the "accident ladder" to enter the hold in the morning, to come up and out for a lunch break, to go back down in the hold after 1:00 p.m., and to climb up the ladder again at 5:00 o'clock.

The record clearly shows that he went back into the hold after 5:00 o'clock using the same ladder a fifth time since he was engaged in working ten and a half hours. This was a long day. He logically had to use the ladder six times before his fall.

The last time Mr. Arceneaux came out of the hold he proceeded with a continuous climb of the 40 foot ladder without getting off at any intermediate deck or any 'tween deck to rest. He failed to use another ladder. There was another ladder forward. The ladder forward was known as a manhole ladder and it was located forward on the bulkhead of the compartment.

Another longshoreman testified that there was no grease on the "accident ladder"; there was no rust on the ladder, and that he

was able to negotiate the so-called "accident ladder" safely and that he had safely negotiated and climbed up and down the ladder a number of times. This longshoreman did not think that the ladder was difficult to negotiate. No contention exists that any rust or oil or foreign substance was on the ladder.

No one in the longshore gang had any occasion to tell any of the ship's crew or the ship's officers that the longshoremen thought the ladder was difficult. No one complained about the ladder on January 21, 1995. The ladder was attached firmly to the wall or the bulkhead of the ship and any person who was physically able could negotiate the ladder. It is unquestioned that at the time of the fall in question, the stevedore had full, complete control of the ship's cargo work area. The ship's crew and the ship's officers were not involved in the cargo loading operations.

A gang boss, a walking boss, and another boss (all in the employ of the stevedore) had not found any condition that would either preclude initiating the cargo loading operations or would require the stoppage of any loading operations. It is also clear that a longshoreman stated that there was not anything in the nature of surprise about the ladder and that if the hatch had been closed at the forward end of the hold, that same hatch was closed by a hatch tender who was a fellow longshoreman.

No member of the crew of the Joseph Lykes nor any officer was involved in the hatch tender's decision to not use the forward access ladder or manhole ladder. The forward ladder was not useable because a fellow longshoreman had closed the forward hatch. That closing was the sole decision of the longshoremen and the actual closing of the hatch was the sole decision of the hatch tender. Toward the end of the overly long work day, Arceneaux had made a complaint about his physical condition and a complaint about being tired.

Concerning the designs of the vessel as a completed ship, the custom of the industry and of Lykes was to basically put on paper very broad outlines of features like ladders. Also, Lykes receives broad suggestions from their various internal departments such as their operating division, the maintenance and repair division, and the traffic division. These suggestions are then turned over to a firm such as Gibbs & Cox, expert, experienced marine architects and engineers who develop these broad ideas into specific designs together with a detailed set of specifications that can be used to build the ship in a shipyard.

Importantly, the Marine Administration pays a construction subsidy to certain shipyards and ship operators. Because of this large money subsidy, originating in the Maritime Administration, the Administration gets involved in the specifications and also in the approval of the contract plans. The Maritime Administration uses field inspectors that conduct inspections of the ship or vessel to see to it that the vessel is being built in compliance with the plans and specifications approved by the Administration.

Thus, it is plainly clear that the design of the ladders had been approved by governmental agencies and inspectors. But more importantly, in the unique case of Mr. Arceneaux, Mr. Arceneaux himself had used the exact, same ladder at least four or five times on the very day in question. The ladder was not only open and obvious to the entire longshoremen gang working in the number three hold but the ladder was actually also open and obvious directly to Mr. Arceneaux. Likewise the design of the said ladder was open and obvious to Mr. Arceneaux who had no trouble and encountered no problems in using the ladder both in ascending the ladder and in descending the ladder four or five times previous to the last time he was ascending the ladder. After the overly long ten and a half hour work day, he became weak or ill or overly tired or fatigued. The stevedore determined the work day.

Because of this unique record involving the actual usage of the very ladder in question by Mr. Arceneaux a number of times, the design factor, if any existed, was superseded and set aside by the open and obvious condition of the ladder and the actual usage of the ladder proving its openness and its obviousness to Mr. Arceneaux.

The Arceneauxs' claim against Lykes is statutory and is grounded in 33 U.S.C.A.

§ 905(b) (1986). This statute, which was amended and liberalized as to the benefits in 1972, permits a person covered by the Longshore and Harbor Worker's Compensation Act to bring a cause of action against a vessel owner in case of an injury *that is caused by the negligence of the vessel.* 33 U.S.C.A. § 905(b). But the negligence must be of a special type; it is limited to maritime negligence pursuant to the 1972 amendment.

Section 905(b) (as amended) provides, in substance and relevant part, that in the event of an injury to a person covered by the Longshoremen's Act and caused by the maritime, special negligence of a vessel, then such a person (or anyone else lawfully entitled) may bring suit and may recover damages by reason of the specialized negligence against such vessel as a third party. And the employee's stevedore contractor shall not be liable to the vessel for such recoverable damages either directly or indirectly caused by the special, maritime negligence and *any agreements or warranties to the contrary shall be void.* The amended statute clearly and mandatorily provides that the *liability of the vessel shall not be based upon the warranty of seaworthiness or a breach of the warranty of seaworthiness.* Indeed, the liability of the vessel *cannot* be based on the warranty of seaworthiness or a breach thereof.

The other opinion relies upon and is based upon *Howlett v. Birkdale Shipping Company,* 512 U.S. ——, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994). The other opinion concludes that in applying tort law principles in the context of stevedoring operations, the United States Supreme Court in *Howlett* determined the shipowner's three duties of care to longshore workers.

The first duty, commonly known as the "turnover duty", is relevant to the condition of the ship *at the commencement of the stevedoring operations.* The majority opinion concedes that its analysis of the instant case at bar is grounded solely on the "turnover duty". No other duty is involved in this appeal and the majority opinion so concedes. The second and third duties are simply not implicated here. Those other two duties are the duty by the shipowner to exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel". That is simply not Arceneaux's case. The third duty is called the "duty to intervene" and concerns the vessel's obligations and duties with regard to cargo operations in the area under the control of the independent stevedore. The third duty is not involved here. The majority's opinion accedes that the third duty is not in Arceneaux's case.

The "turnover duty" places upon the shipowner the duty to warn the longshore workers *of latent hazards or hidden hazards. Latent or hidden hazards are defined in this context as hazards that are not known to the stevedore and that would be neither obvious or anticipated by* a skilled, experienced stevedore in the competent performance of his work. As stated above, the ladder in question was open and obvious. No latent or hidden defects existed in the "accident ladder". *Arceneaux had used the ladder a number of times on the very date in question.* Basic also to the concept of liability in tort based on negligence is the concept of foreseeability and proximate cause. No evidence exists of proximate cause visited upon and against Lykes. No foreseeability is shown against Lykes.

Since Arceneaux's complaint and allegations and the Ninth Court's opinion implicate only the vessel owner's "turnover duty", a concise statement of the "turnover duty" is important and determinative. The Federal Supreme Court set out the "turnover duty" in *Federal Marine Terminals, Inc. v. Burnside Shipping Company,* 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969).

*A vessel owner is obligated to exercise ordinary care under the circumstances to turnover the vessel and its equipment in such condition that an expert and experienced stevedore, mindful of the dangers that the stevedore or skilled longshoremen should expect to encounter arising from the hazards of the ship* will be able (exercising ordinary care) to carry on the cargo operations (such as loading) with reasonable safety to persons and property. The breach of this specific duty gives rise to a cause of action for money damages; but the personal injuries and dam-

ages must be proximately caused by the special and specific negligence amounting to a particularized breach of the limited duty. *Marine Terminals, supra.* Under the extremely unusual, clear facts of Arceneaux's case, the element of proximate cause and resulting damages allegedly caused by the ship is totally negated and that necessary element is totally absent as a matter of law.

No latent or hidden defect or danger exists in relationship to the so-called "accident ladder". The "accident ladder" was certainly reasonably expected to be encountered by the skilled longshoremen of experience and expertise in the performance of stevedoring work aboard the ship. A paramount corollary rule or concept to the "turnover duty" requires the vessel owner to warn the stevedore of any hazards on the ship or with respect to its equipment so long (but only so long) as the hazards are known to the vessel or should be known to it in the exercise of ordinary care and that the hazard would likely be encountered by the stevedore in the course of the cargo operations *and are not known by the stevedore and which hazards would not be obvious to him* provided the stevedore or longshoreman is reasonably competent in the performance of his work.

Under this record it is proved as a matter of law that the ladder was known to Arceneaux and the condition of the ladder was fully known and fully appreciated by Arceneaux. The ladder was open and obvious to the stevedore. *Howlett, supra.* The "turnover duty" to warn extends to and implicates certain latent or hidden hazards in the cargo stow. Here, as distinguished from *Howlett,* there was no latent or hidden hazard in the cargo stow.

In *Howlett,* Birkdale Shipping Company failed to warn that the 'tween deck was covered with a slippery plastic material rather than (as was ordinarily and usually the situation) paper and plywood; *also the plastic was latent and hidden under bags of cocoa beans.* The record in *Howlett* showed that to protect a stow of cocoa beans against condensation damage, it was usual and very customary to lay paper and plywood on the steel deck. Plastic could not be anticipated by the longshoreman because the plastic tends to actual-

ly aggravate condensation damage and thereby increase the condensation damages to the cocoa stow when the plastic is positioned upon a steel deck. The Ninth Court's opinion places paramount reliance upon *Howlett,* the facts of which are extraordinarily different and distinguishable from Arceneaux's case.

Indeed, in *Howlett,* Justice Kennedy repeated the precise contours of the duty to warn. That duty to warn relates to latent hazards *and must be defined and proscribed with due regard to the concurrent duties of the stevedore and to the statutory scheme of longshoreman's compensation as a whole.* Justice Kennedy emphasized these contours by stating that:

> It bears repeating that the duty attaches only to latent hazards, defined in this context as *hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations.* In addition, the vessel's duty to warn is confined to latent hazards that "are known to the vessel or should be known to it in the exercise of reasonable care." *Ibid.* Absent actual knowledge of a hazard, then, the duty to warn may attach only if the exercise of reasonable care would place upon the shipowner an obligation to inspect for or discover the hazard's existence. (Emphasis added)

*Howlett,* 512 U.S. at ——, 114 S.Ct. at 2064, 129 L.Ed.2d at 88. The so-called "accident ladder" had no latent hazards. The ladder was in no sense latent or hidden. The ladder was obvious to and anticipated by the stevedore. Justice Kennedy also declined to adopt the Restatements (2nd) of Torts § 412 (1965). *Id.* Land-based principles do not furnish sure guidance in maritime cases.

Justice Kennedy reaffirmed and approved the high court's holding in *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), holding "absent contract provision, positive law, or custom to the contrary," a vessel "has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Scin-*

*dia, supra.* Indeed, the stevedore, an independent contractor, has the duty as the longshoreman's actual employer to provide a reasonably safe place to work and to take and make safeguards necessary to avoid injuries. *Scindia Steam,* 451 U.S. at 170, 101 S.Ct. at 1623–24, 68 L.Ed.2d at 14. Moreover, the stevedore is definitely in the best position to avoid accidents during cargo operations and the shipowner has the right to rely upon the stevedore's warranty of performance.

The Ninth Court's opinion ultimately results in an analysis of the summary judgment evidence in regard to only three propositions of possible liability. Proposition one: that the ladder in question was an open and obvious hazard; proposition two: that if not an open and obvious hazard, the ladder was a hazard that was known to the stevedore or that said hazard was obvious to him or that it could be anticipated by a skilled stevedore competently performing his job in a good and workman like manner; proposition three: that even if material fact issues existed with regard to proposition one and two, the shipowner had no actual knowledge of the alleged hazardous ladder and indeed should not have known of its alleged hazardous nature even in the exercise of reasonable care. These propositions of possible liability related to the "turnover duty".

Thus, proposition three is not implicated if no material fact issue exists relevant to proposition one or two. Clearly, the "accident ladder" was open and obvious; its design was open and obvious. It was a clear day. There was no dirt or other substance on the ladder. The cargo operation was conducted in daylight. Also, pertinent to proposition two, even if the ladder were not open and obvious; nevertheless, the "accident ladder" was maybe arguably a "hazard" (if it was a "hazard") *that was known to the stevedore and the ladder was obvious to Arceneaux and the ladder was actually anticipated and repeatedly used by Arceneaux, a skilled and experienced longshoreman.* Arceneaux had descended and ascended and used the ladder at least four or five times personally on the very day in question.

Thus, this dissent respectfully submits that even under the Ninth Court's analysis of the summary judgment evidence, the judgment in favor of Lykes should be affirmed.

There was nothing hidden or latent about the ladder. The ladder was plainly apparent to the stevedore, the longshoremen, and to Arceneaux. In fact, a number of longshoremen, who were present and who had worked in the number three hold of the Joseph Lykes on the same day of Mr. Arceneaux's accident, stated that they were aware of the offset in the ladder and that they were also aware of any difficulty that the open and obvious ladder presented in climbing up the same.

The duty of ordinary care to warn extends insofar (but only insofar) as to warning stevedores and longshoremen of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of ordinary care, that are likely to be encountered by the stevedore and the longshoremen in the course of cargo operations *and that are not known to the stevedore or longshoremen and would not be obvious to or anticipated by the stevedore or longshoremen if the stevedore and longshoremen were experienced and competent to perform the work. Scindia, supra.* Arceneaux's fact situation and his experience and usage of the ladder definitely placed this cause of action, at best, as one coming under the unseaworthiness doctrine. Congress has prohibited Arceneaux from suing on the warranty of seaworthiness.

The Longshore and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901 et seq., establishes a comprehensive federal compensation program that provides longshoremen and their families with medical, disability and survivor benefits for work-related injuries and death. The injured or deceased longshoremen's employer in most cases is an independent contractor stevedore, as here. The independent stevedore must pay the statutory benefits regardless of fault but, in turn, the independent stevedore is shielded from any further liability to the longshoreman. The crucial 1972 amendments to the Act brought about certain fundamental changes in the nature of any third party action which the longshoreman may

bring against the vessel or the owners of the vessel.

Of paramount importance, the 1972 amendment abolished the longshoremen's pre-existing right to sue the shipowner based on the warranty of seaworthiness. A cause of action based upon the warranty of seaworthiness had been previously established in the then, landmark case of *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). And very important, especially as implicated and applied here, is the amended Section 5(b) which eliminated the stevedore's obligation imposed by *Ryan Stevedoring Co. v. Pan–Atlantic SS Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) to then, in turn, indemnify a shipowner if the shipowner were held liable to a longshoreman for a breach by the stevedore of the stevedore's express or implied warranty to conduct cargo operations in a reasonably safe and workmanlike manner. If the vessel is held liable, it can not attain indemnity against the stevedore.

The record compellingly reflects that the positive and direct testimony (on the issue of which legal entity created the design changes) concerning the ladder in question points to either Gibbs and Cox, marine architects, or Ingalls Ship Building Company—not Lykes.

Lykes did not design the ladder. The ladder as constructed was first made into a mockup. This mockup was tested by the Marine Administration as well as the United States Coast Guard. The testing was also conducted by Ingalls and Gibbs & Cox. The only viable alternative at the time was a so-called pivoting ladder. The pivoting ladder was beset by numerous, serious safety hazards.

The history and experience of the ladders in question, although Arceneaux contends otherwise, clearly show a record (in an uncontroverted manner) that in over 35 years or perhaps 40 years of use on five vessels of the same class as the Joseph Lykes, that no longshoreman was ever known to have fallen from the ladders. From the historical record, the only accident involved a construction worker engaged in the building of a sister ship of the same class. The worker was not a longshoreman. The prior accident was dealt with in the case of *Caillouet v. Lykes Brothers Steamship Co., Inc.*, 431 F.2d 707 (5th Cir.1970). The Fifth Circuit held that an admiralty case arose when Caillouet, plaintiff-appellant, fell while descending a hatch ladder of a vessel on which he was working. At the time of the fall, *it was raining and Caillouet was carrying a thermos of hot coffee on the little finger of his left hand by the ring of the cup which was attached to thermos bottle.* The plaintiff-appellant claimed that the fall was caused by the negligent design of the hatch ladder. The Fifth Circuit agreed with the district court's ruling that the plaintiff-appellant failed to show a causal connection between his fall and the design of the ladder.

### Arceneaux's Allegation of Defective Design Constitutes Complaints of Unseaworthiness

Arceneaux's major liability theory contends that the design of the "accident ladder" in the number three hold was physically challenging and over taxing to him at the end of the long work day in view of Arceneaux's physical abilities and limitations when combined with his age and physical condition. Thus, the *design of the ladder* he claims caused the fall or accident in question. Under this record and even under Arceneaux's allegations these contentions were no longer actionable under Congressional action in 1972. Arceneaux's basic position in this respect is that our Ninth Court should abandon the well-settled principles of federal maritime law and hold that Lykes Brothers should be liable for simply continuing to operate the Joseph Lykes without redesigning and building or rebuilding new ladders in the vessel's cargo hold or for failing to forbid the longshoreman to use the ladders in the number three hold.

Without question, Mr. Arceneaux was acting as a longshoreman and he alleged his cause of action strictly as a maritime tort exclusively in the admiralty jurisdiction. Therefore, his only remedy against the shipowner *is for actual negligence under the Longshore & Harbor Workers' Compensation Act.* In 1972 Congress, after increasing

in a very substantial way, the compensation benefit for longshoreman, totally abolished the longshormens' right or cause of action to sue the vessel owner for injuries caused by an unseaworthy condition of the ship and thus, also, Congress abolished the shipowner's right to recover indemnity from the stevedore because of the stevedore's breach of its duties.

Congress engaged in a compromise and a trade off between and amongst the conflicting interests in the 1972 amendments. The longshoremen received very substantially liberalized and increasingly generous benefits. The trade off was the elimination of unseaworthiness claims against the vessel owner. This trade off or compromise was based on sound reason and salutary public policy because the stevedore was in a much superior position to prevent injuries to his employees. The stevedore was in control of the cargo loading operations—not the vessel owner or the vessel's officers.

Section 905(b) is governing and the language to be focused upon is:

> If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel ... The liability of the vessel under this sub-section shall not be based [on] the warranty of seaworthiness or a breach thereof at the time the injury occurred ...

In *Boncich v. M.P. Howlett, Inc.,* 421 F.Supp. 1300 (E.D.N.Y.1976), it was held that Regina Boncich could not assert as an independent basis of recovery an action based in strict tort liability in addition to her alleged negligence claim against the vessel owner. The *Boncich* court referred to House Report No. 92–1441, 92nd Congress, 2nd Session (1972), U.S. Congressional and Administrative News (1972), pgs. 4698, 4703.

After considering the same, the *Boncich* court held, in a significant decision, that the 1972 amendments specifically eliminated an unseaworthiness claim *against the vessel owner resulting from defective gear or defective equipment of the vessel or the defective gear or the defective equipment of the inde-pendent stevedore. Nor could a negligence claim be based on defective gear or equipment.* Hence, manifestly, the allegedly defective ladder or the allegedly defectively designed ladder on the Joseph Lykes in the number three hold constituted gear, appliances, or appurtenances that were previously covered by the seaworthiness doctrine, and clearly the 1972 Congressional amendments specifically eliminated claims based on unseaworthiness. A claim by a longshoreman based on a defective ladder or defectively designed ladder are no longer cognizable against the vessel owner. *Such claims are prohibited even though such claims may be alleged as negligence or couched in terms of strict liability in tort—no matter how artfully done.*

The *Boncich* court disallowed a strict liability tort claim after the all important 1972 amendments. As well, the overwhelming weight of authority and sound reason have disallowed to longshoremen claims based on violations of OSHA/ANSI *as well as the disallowance of claims based on negligent design.* Significantly, it has been held that liability without fault is barred under Section 905(b). Strict products liability, as well, is prohibited. See *Hess v. Upper Mississippi Towing Corp.,* 559 F.2d 1030 (5th Cir.1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978).

The *Hess* court *disallowed a claim based on strict liability even though the gas freeing operation involved was "ultra hazardous".* The *Hess* court concluded that the Congressional committee reports that accompanied the 1972 amendments placed heavy emphasis on an intent by Congress to eliminate unseaworthiness, a strict liability concept and therefore also to disallow a claim based on strict liability. The writer of the *Hess* opinion stated: *"It would be inappropriate to judicially read strict liability into the text of the statute in view of obvious congressional intent."*

Importantly, in *Hess,* the plaintiff alleged that *even though the gas line involved in the barge was a "open and obvious" danger, the defendants should be subject to liability because the defendants failed to take due care*

with respect to a dangerous condition aboard the barge in question and that the dangerous condition was "ultra hazardous". In *Hess*, the danger was well known to all concerned. In this case at bar, the "accident ladder" was "open and obvious" and was well known to all concerned. Thus, *even though a danger may be "ultra hazardous" if the same is open and obvious and is known to the longshoremen a cause of action for liability and damages against the vessel owner will not lie.* Arceneaux was not working in "ultra hazardous" conditions. The Fifth Circuit has ruled that an allegation of a violation of OSHA regulations by a vessel constitutes a claim of unseaworthiness rather than negligence. *See and compare Castorina v. Lykes Brothers SS Co., Inc.,* 758 F.2d 1025 (5th Cir.), *cert. denied,* 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985).

Product liability claims against the vessel owner are proscribed by the amended Section 905. The longshoreman has to prove that the shipowner was negligent as negligence is defined and understood in maritime law. Arceneaux has totally failed to show maritime negligence. This record is devoid of maritime negligence. Lykes has shown no maritime negligence as a matter of law. *See Wilhelm v. Associated Container Transportation, Ltd.,* 648 F.2d 1197 (9th Cir.1981).

In *Castorina v. Lykes Brothers SS Co., Inc., supra,* the court set forth the basic principles and guidelines governing a vessel owner's duty to longshoremen employed by an independent stevedore. The duty is set out in these words:

> Before turning the ship over to the stevedore, the shipowner must 'exercise ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on the cargo operations with reasonable safety to persons and property'... [cite omitted] The vessel owner must warn the stevedore of any hazards with respect to the ship or its equipment of which the shipowner is aware or should by the exercise of reasonable care be aware *which would not be obvious*

> *to or anticipated by a reasonably competent stevedore.* (emphasis added)

Here, as a matter of law under this record, the ladder involved was open and obvious to the stevedore and to the longshoreman and it necessarily had to be anticipated and was anticipated and used repeatedly by Arceneaux. But even so, the plaintiff does not clearly base his cause of action on a failure to warn. Thus under *Castorina* there is no liability against the shipowner in favor of Arceneaux. Arceneaux had complete knowledge of the ladder.

An additional reason for non-liability here is that after the shipowner turns over the vessel to the stevedore and to the longshoreman for cargo operations and after cargo operations begin, the shipowner may properly rely upon the stevedore to discharge his duties in a workmanlike manner, the stevedore avoiding exposing the longshoreman to unreasonable risks or hazards. The shipowner then owes no duty of supervision. The vessel owner has no duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop in the confines of the cargo operations that have been assigned over to the stevedore.

Once the loading or cargo operations have begun by the independent stevedore contractor, the shipowner to be subject to liability must have both actual knowledge of the alleged dangerous condition and actual knowledge of the stevedore's unreasonable conduct in dealing with the dangerous condition. Here, Lykes Brothers had no actual knowledge of the dangerous condition if one existed as to Arceneaux, after the longshoreman had used the ladder both ascending and descending four or five times; nor did Lykes have actual knowledge of the stevedore's conduct in working a ten and a half hour day and thereby tiring Arceneaux. Lykes knew nothing of the closing of the hatch by the forward ladder. *See Duplantis v. Zigler Shipyards, Inc.,* 692 F.2d 372 (5th Cir.1982); *Hill v. Texaco, Inc.,* 674 F.2d 447 (5th Cir. 1982).

Here, Lykes Brothers did not have actual knowledge and actual awareness that the stevedore had indeed failed to adequately

protect against a danger, if any existed. Clearly the danger created by closing the hatch was caused by the stevedore's official. The record shows as a matter of law that there was another ladder available and accessible to Arceneaux for part of the work day. But the stevedore walking boss had closed the hatch making the second ladder unusable as a practical matter. Lykes did not have knowledge of this fact. The stevedore walking boss forced Arceneaux to ascend the "accident ladder" at the end of a ten and a half hour work day.

### The Negligent Design Concept and Cases

After the 1972 revolutionary amendments a shipowner's liability based on either a theory of unseaworthiness or on a theory of nondelegable duty were foreclosed. The amendment of the statute necessarily and absolutely precluded a longshoreman from suing the vessel on which he was laboring or the owner of the vessel for breach of the warranty of seaworthiness. However, if a shipowner fails to warn the stevedore of a hidden danger—the latent or hidden nature of the danger must be stressed—*which hidden danger was known to the shipowner, or should have been known in the exercise of ordinary care,* the shipowner could be liable if that special form of negligence causes injuries to a longshoreman.

There exists no longer any warranty, however, running to the workman or the longshoreman that the vessel is free from defect. Once the stevedore's cargo operation has begun, the shipowner has no general duty to supervise or inspect to discover dangerous conditions that develop within the confines of the cargo operations. These cargo operations are assigned to the stevedore. The stevedore controls the same.

The case of *Bilderbeck v. World Wide Shipping Agency,* 776 F.2d 817 (9th Cir.1985) confronts the issue of negligent design. Bilderbeck's pleadings and contentions squarely raised the issue of negligent design in several ways. He charged that the defendants designed, manufactured, sold, serviced, treated, owned, controlled, constructed, maintained, distributed, assembled, altered, repaired, and modified the vessel M/V STAR MAGNET and its gear and appliances and component parts and that said activities and design were negligently and defectively performed and that therefore these actions would render the vessel, its gear, appliances, and component parts dangerous to the lives and limbs of persons who must work aboard said vessel.

A further pleading stated that as a direct and proximate result of a defective and negligent design, manufacturer, ownership, testing, control, construction, maintenance, alteration repair and moderation of the vessel, its gears, appliances, and component parts created a hazard to persons including Bilderbeck. As a direct and proximate result of said defects in design and defects of other matters and actions of the said defendants the said defendants were negligent because they failed to warn of the said defects and, therefore, caused Bilderbeck to suffer severe personal injuries. The Ninth Circuit concluded and held that such allegations of negligent design was just another way of alleging that the vessel was not seaworthy. Concerning the causation and the proximate cause issues, the Bilderbeck court concluded that these allegations were just an alternative way of saying that the vessel was unseaworthy and that the unseaworthiness of the vessel caused the injury.

In *Salvato v. Hakko Maritime Corp.,* 718 F.Supp. 1443 (N.D.Cal.1989) *the opinion squarely held that a claim for negligent design is another way of alleging that the ship was not seaworthy at the time of the accident. And the liability of the vessel for unseaworthiness was specifically eliminated in the 1972 amendments.* The Salvato court reaffirmed the well-established rule that the vessel is under no duty to supervise, inspect, or intervene to discover dangerous conditions that develop during the cargo operations. A longshoreman hatch tender closed a hatch that closed off the non-offset ladder. Lykes was not responsible.

Here, the cargo operations were extended to a ten and a half hour day and Arceneaux, it was clearly established, experienced fatigue towards the very end of the extended workday. Lykes Brothers had no duty and indeed was not in a position to tell the stevedore how to conduct the loading operations.

Indeed, it is the stevedore and not the vessel that has the duty to insure safety and to deal with risks on a ship which are encountered during the stevedoring operation. Importantly, the vessel and the vessel's owners may rely upon the stevedore to avoid exposing the longshoreman to unreasonable hazards. Moreover, the obviousness and the openness of the design of the ladder negates any possible duty visited upon and against Lykes. Arceneaux was aware of the ladder and its configuration. *See Salvato, supra.*

### *McConnell v. Southside School District Opinion and its Tract Wake*

In *McConnell v. Southside School District,* 858 S.W.2d 337 (Tex.1993) the Supreme Court detailed the correct actions that must be taken by the non-movant in the non-movant's answer or response. The Supreme Court reasoned and held that consistent with and in comporting to the precise language of Rule 166a(c) that a motion for summary judgment must *itself* expressly present the grounds upon which it is made and upon which the movant relies for relief.

And of paramount importance, a motion for summary judgment must stand or fall on the grounds expressly presented in the motion itself. Therefore, in determining whether the grounds were expressly presented to the court below, reliance (by the movant) may not be placed on briefs or summary judgment evidence or proof. Therefore, in a parallel manner, issues that a non-movant contends avoid the movant's entitlement to a summary judgment must themselves (the non-movant's issues) be expressly presented by a written answer or correct response by the non-movant to the motion for summary judgment and if these issues are not so expressly presented to the trial court, they cannot be brought forward by a reference to summary judgment evidence, deposition testimony, or proof. *See City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671 (Tex.1979).

In *McConnell,* the Supreme Court reaffirmed that the non-movant must expressly present to the trial court in his answer or response any reasons or issues or defenses seeking to avoid or defeat the movant's entitlement to a favorable summary judgment. Thus, the reason, rationale, and purpose of Rule 166a(c) is to provide adequate information for opposing the motion and also to definitely define and limit the issues. *See and compare Weaver v. Stewart,* 825 S.W.2d 183, 184–85 (Tex.App.—Houston [14th Dist.] 1992, writ denied).

Comporting to Rule 166a(c) is important because it provides the opposing party (the movant here) with notice of all matters expected to be asserted in fully presenting and arguing the motion for summary judgment. In *McConnell,* Justice Hightower concluded that the interpretation of the summary judgment rules advance the policy of insuring clarity and simplicity in summary judgment practice and procedure. *See e.g., Black v. Victoria Lloyds Ins. Co.,* 797 S.W.2d 20, 27 (Tex.1990). Hence, issues not expressly presented to the trial court by written motion, written answer, or other correct response shall not be considered on appeal and cannot be grounds for reversal on appeal.

Of course, a summary judgment motion necessarily must stand or fall upon its very own merits and the non-movant's neglect or failure to answer or respond cannot supply *by default* the summary judgment proof necessary to establish the movant's right to a summary judgment as a matter of law. *Clear Creek,* 589 S.W.2d at 678.

However, if a non-movant fails to prevent any issues in its response or answer, the movant's right to a favorable judgment is not solely established by such failure and the movant must still establish his or its entitlement to a summary judgment. But, there is a negative effect as to the non-movant. That negative effect (of such a failure on the part of the non-movant) *is that the non-movant is limited on appeal to urging and arguing only the legal sufficiency of the grounds presented by the movant.* Any issues of factual insufficiency are not available to the defaulting or partially defaulting non-movant.

Therefore, Arceneaux's contention that Lykes' (factually-alleged) involvement in the design of the ladder in some manner differentiates and distinguishes Arceneaux's claim and somehow theoretically transforms his

claims into allegations of negligence, which are cognizable under the amended Section 905(b), were simply not presented or urged to the trial bench.

The plaintiff fell from a ladder that was designed, constructed, and completed in 1971. A total absence of summary judgment proof reveals and proves that Lykes did not draw the specifications for that ladder. Thus, under the record, there is no basis or grounds upon which Arceneaux can argue that the *Bilderbeck* case is *factually* distinguishable. The *Bilderbeck* opinion is highly persuasive and determinative in view of the appellant's procedural posture. In *Bilderbeck*, the Federal Circuit Court affirmed the Federal District Court in significant part on that plaintiff's failure to plead that the vessel owner had either negligently altered the equipment in question or that the equipment was rendered unsafe by its negligently drawn specifications.

The procedural history and posture show that the appellant, Arceneaux, failed to raise those important issues before the trial bench. And Arceneaux has failed as well to cite any fact in the record which lends any support to the argument that in 1971 Lykes altered the ladder or drew the specifications for the same.

At best, Arceneaux's claim is one for breach of the warranty of seaworthiness which has decisively been prohibited by the United State Congress. The bench below applied the proper legal standards. The trial court's judgment under current law should be affirmed.

The vessel and the vessel owners have no general duty of supervision or inspection or the duty even to exercise reasonable care to discover dangerous and hazardous conditions and risks that develop in and during the cargo loading operations when, as here, these cargo loading operations are assigned to the independent stevedore. This rule of law relieving the vessels and the vessel owners from such a duty is founded upon the equitable and justifiable expectation of the vessel and its owners that the independent stevedore would and will perform with reasonable competence and that the stevedore will see to the safety of the cargo operations. *See Met-*

*ropolitan Stevedore Co. v. Dampskisaktieselskabet Int'l,* 274 F.2d 875 (9th Cir.), *cert. denied,* 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed.2d 1147 (1960).

These reasonable and justified expectations are based in substantial part upon subsection a of the act, 33 U.S.C.A. § 941 requiring the stevedore as the employer of the longshoreman, to provide a "reasonably safe" place to work and to take the necessary safeguards to avoid injuries and the expectations also flow from the indemnity cases that were decided prior to the 1972 amendment which indemnity cases held and taught that the stevedore is in a much better position to avoid accidents during the cargo operation.

Therefore the shipowner can justifiably rely upon the stevedore's warranty of competence in the performance of furnishing skilled, able, experienced longshoremen. The stevedore's obligations, responsibilities, and duties in this regard concerning the cargo loading operations cannot be diminished or transferred to the vessel. If these last-mentioned duties were imposed upon the vessel, such a result would thwart the Congressional will and intent and would also decrease significantly and drastically the incentive towards the safety of the longshoremen by the stevedore. *Undoubtedly, the stevedore is in the best position to prevent injuries. Scindia Steam, supra.* Therefore, given the practical realities of the stevedoring industry and the maritime trade in connection therewith, the incentives of the stevedore to prevent injuries must not be in any degree diminished.

It has been a settled rule that maritime custom and practice and independent stevedore practice and procedures clearly demonstrate that the stevedore exercises not only primary control over the details of the cargo operations but, as here, complete control over the cargo loading operations. *See Italia Societa v. Oregon Stevedoring Co.,* 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). The United States Supreme Court in *Howlett v. Birkdale Shipping Co., supra,* forcefully held that there can be no recovery now under section 5(b) for a vessel's failure to warn of dangers that would be apparent to a long-

shoreman of reasonable competence. *See also Scindia Steam, supra,* at 167, 101 S.Ct. at 1622, 68 L.Ed.2d at 12–13.

In summary then, the vessel's turnover duty is to warn of latent defects in the cargo stow and in the cargo area—this is not a latent defect case. This turnover duty is a narrow one. This narrow duty attaches solely and alone to latent hazards, defined as hazards *that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work.* In the case at bar, there is simply no latent or hidden defect. Following *Howlett,* the defendant simply had no duty or obligation even to exercise reasonable care to supervise the ongoing loading operations of the independent stevedore and plainly Lykes Brothers could not have examined Arceneaux during the course of the day to determine whether or not he had become tired or fatigued at the end of a ten and a half hour work day. The stevedore controlled Arceneaux and his hours of work.

Congress has spoken, Congress has passed legislation. A longshoreman can no longer recover for conditions that are open and obvious to the stevedore and to the longshoreman. The longshoreman no longer can recover under the warranty of seaworthiness. The district court should be affirmed.

A fresh decision has been rendered in *V.B. Keller v. United States,* 38 F.3d 16 (1st Cir. 1994). Keller was a longshoreman who was injured in a fall while he was ascending a ladder coming out of a ship's hold. Keller also pleaded negligence against the vessel by way of unsafe design. Keller's facts are parallel and similar in important aspects to Arceneaux's facts. The basis of the holding and the rationale in *Keller* is dispositive of Arceneaux's case. The First Circuit affirmed the judgment in favor of the vessel in *Keller* and held that the plaintiff longshoreman had failed to show how the alleged hazard was latent or not readily foreseeable by the longshoreman and/or his employer, the independent stevedore. Concerning the nature of the alleged hazard, the First Circuit Court reasoned and held through an opinion by Justice Cyr, circuit judge. I quote:

... even if the district court had agreed with Bijhouwer's assessment of the risks attending the two alternate methods of egress, Bijhouwer never intimated that those methods posed hazards not readily foreseeable by Simplex. *Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622 (noting that duty to warn exists only if "defect" "would not be obvious to or anticipated by [stevedore] if reasonably competent in the performance of his work"). The alleged design defect (two fixed railings) was in no sense latent. Unlike a hairline fracture in the rung of a ladder, for example, which might render the ladder configuration not reasonably safe for *any* unwarned usage, the juxtaposition of the two railings and the absence of posted instructions put Simplex on notice that its employees, unless instructed otherwise, might attempt to exit Tank 4 in any of three ways. If Simplex had deemed Bijhouwer's "under" method the only "safe" one, it could have instructed its employees not to use the two alternate methods. Or if it considered all three methods "unsafe," it could have removed the railings between the stanchions at the top of the ladder.

Relying on the fact that he was never in Tank 4 prior to the night of the accident, Keller wrongly presumes that obviousness and latency are measured by what a relatively inexperienced longshore *worker* might observe. Instead, the *Scindia* standard turns primarily on what an "experienced" stevedore, like *Simplex,* reasonably would be expected to notice. By the same token, if the district court correctly found that even Simplex longshore *workers* reasonably could be expected to recognize any such defects, it surely follows that their more experienced stevedore-employer should have discovered the defects during the course of its extended two-year stewardship of the HUDDELL. *See Bjaranson,* 873 F.2d [1204] at 1209 n. 7 ("The condition of the ladder was apparent and obvious when Bjaranson's employer, the stevedoring contractor, boarded the ship and assumed the control of cargo operation. Although the condition may not have

been obvious to Bjaranson at night, the fact that the condition was obvious to *his employer* eliminated whatever duty there may have been upon [the vessel owner] to warn the individual employees.") (emphasis in original).

*Id.,* at 29–30.

The so-called "accident ladder" in Arceneaux's case had no condition even remotely comparable to a "hair-line fracture" in a rung of the ladder. But instead, the ladder had an open and obvious offset which the longshoremen, including Arceneaux who was a longshoreman with long experience, knew existed and these experienced longshoremen knew that these offsets were open and obvious.

But again, Arceneaux did not fall from an offset in the ladder. These longshoremen, including Arceneaux, were very well experienced and the stevedore was an expert, competent one. The longshoremen were well acquainted with the climbing conditions and the requirements of the ladder and they knew of the vertical ladder with the offset. There simply was no latent, unknown, or unappreciated hazard or condition. The ladder in this case was one that the longshoremen as experts and experienced workers daily addressed and used without incident through the exercise of reasonable care.

Robert Braneff testified that the ladder in question was one that he had been on and used literally hundreds of times. Russell Bertrand testified that these ladders and what he called a curve round the coaming were known to the longshoremen. Mitchell Berg testified in substance that the bends in the ladder were very obvious and it was something that longshoreman in this area should be and were familiar with.

In the *Howlett* case, the Supreme Court held that even if the vessel had knowledge of the sheet of clear plastic that had been placed under a stowed cargo of bagged coco beans; nevertheless, Howlett had to further demonstrate that the alleged hazard involving the clear plastic would have been neither obvious to nor anticipated by a skilled and competent stevedore. In *Howlett,* the high court made it expressly and glaringly clear that the shipowner's "turn over duty" only extends to latent hazards that it [the ship]

knows of or in the exercise of reasonable care should know of, *and* which hazards are not known to the stevedore and would not be obvious or expected by the stevedore in the competent performance of his work. Thus, it is clear that the *Howlett* court did not change or diminish *Scindia's* unequivocal ruling that 33 U.S.C. § 905(b) forecloses and disallows shipowner's liability for alleged unseaworthiness or for stevedore negligence. *See Howlett,* 512 U.S. at ——, 114 S.Ct. at 2063–65, 129 L.Ed.2d at 87–89.