# HOWLETT *v.* BIRKDALE SHIPPING CO., S. A.

No. 93–670.   Argued April 20, 1994—Decided June 13, 1994

KENNEDY, J., delivered the opinion for a unanimous Court.

*Charles Sovel* argued the cause for petitioner. With him on the briefs was *Stanley B. Gruber.*

*Carl D. Buchholz III* argued the cause for respondent. With him on the brief was *Michael P. Zipfel.**

JUSTICE KENNEDY delivered the opinion of the Court.

Under § 5(b) of the Longshore and Harbor Workers' Compensation Act, 33 U. S. C. § 905(b), a shipowner must exercise ordinary care to maintain the ship and its equipment in a

---

*\*Thomas D. Wilcox* and *Charles T. Carroll, Jr.,* filed a brief for the National Association of Waterfront Employers as *amicus curiae* urging reversal.

*Graydon S. Staring* and *John A. Flynn* filed a brief for the American Institute of Merchant Shipping as *amicus curiae* urging affirmance.

condition so that an expert and experienced stevedore can load and unload cargo with reasonable safety. As a corollary to this duty, the shipowner must warn the stevedore of latent hazards, as the term is defined in maritime law, that are known or should be known to the shipowner. This case requires us to define the circumstances under which a shipowner must warn of latent hazards in the cargo stow or cargo area.

I

The case arrives after a grant of summary judgment to respondent Birkdale Shipping Co., S. A., so we consider the facts in the light most favorable to petitioner Albert Howlett. Howlett, a longshoreman employed in the Port of Philadelphia by stevedore Northern Shipping Co., was injured while discharging bags of cocoa beans from a cargo hold on the MV *Presidente Ibanez*, a ship owned and operated by Birkdale. During the unloading operation, Howlett and three other longshoremen hooked up a draft, or load, of bags stowed on the tween deck of the hold. When the ship's boom lifted the draft out of the hold, an 8-square-foot area of the tween deck was exposed. Howlett, who was standing on surrounding bags, jumped down about three feet to the deck, where he slipped and fell on a sheet of clear plastic that had been placed under the cargo. As a result of his fall, Howlett sustained serious injuries that have disabled him from returning to work as a longshoreman.

Howlett brought suit against Birkdale under § 5(b) of the Act. Both parties agreed that it is customary to lay paper and plywood on a steel deck to protect a stow of cocoa beans against condensation damage. They also agreed that, for purposes of protecting the beans, it was improper to use plastic, which tends to aggravate condensation damage rather than prevent it. Evidence adduced during pretrial proceedings suggested that the independent stevedore engaged by Birkdale to load the beans in Guayaquil, Ecuador, had placed the plastic on the tween deck. Further evidence

showed that the vessel had supplied the Guayaquil stevedore with the plastic, along with other material used in stowing cargo, including paper, plywood, and dunnage. Howlett claimed that before jumping to the deck he did not see the plastic, which was covered by dirt and debris. He charged that Birkdale was negligent in failing to warn Northern and its longshoremen-employees of this dangerous condition.

The United States District Court for the Eastern District of Pennsylvania granted summary judgment in favor of Birkdale. Relying upon *Derr* v. *Kawasaki Kisen K. K.*, 835 F. 2d 490 (CA3 1987), cert. denied, 486 U. S. 1007 (1988), the court held that Howlett, to prevail on his failure-to-warn claim, had to demonstrate that Birkdale had actual knowledge of the hazardous condition and that the condition was not open and obvious. After reviewing the record, the court concluded that Howlett had failed to present evidence sufficient to sustain his claim. The court declined to infer that Birkdale had actual knowledge of the condition from the fact that it had supplied the Guayaquil stevedore with the plastic, reasoning that "being the supplier of equipment does not necessarily imply knowledge of its intended purpose." App. to Pet. for Cert. 4a. The court further declined to infer actual knowledge from the fact that the members of the vessel's crew were present on the top deck during the loading operation. And even if the Guayaquil stevedore's improper use of plastic had been apparent to the crew, the court continued, "then it readily transpires that this was an open and obvious condition" for which Howlett could not recover. *Ibid.* The Court of Appeals affirmed without opinion, judgt. order reported at 998 F. 2d 1003 (CA3 1993).

We granted certiorari, 510 U. S. 1039 (1994), to resolve a conflict among the Circuits regarding the scope of the shipowners' duty to warn of latent hazards in the cargo stow, an inquiry that depends in large part upon the nature of the shipowners' duty to inspect for such defects. Compare *Derr* v. *Kawasaki Kisen K. K.*, *supra* (vessel need not inspect or

supervise the loading stevedore's cargo operations for the benefit of longshoremen in later ports), with *Turner* v. *Japan Lines, Ltd.*, 651 F. 2d 1300 (CA9 1981) (vessel must supervise a foreign stevedore's loading operations), cert. denied, 459 U. S. 967 (1982).

## II

The Longshore and Harbor Workers' Compensation Act, 44 Stat. 1424, as amended, 33 U. S. C. § 901 *et seq.*, establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death. See generally T. Schoenbaum, Admiralty and Maritime Law § 6–6 (1987); M. Norris, Law of Maritime Personal Injuries §§ 4:11, 4:22–4:29 (4th ed. 1990). The injured longshoreman's employer—in most instances, an independent stevedore, see *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U. S. 256, 263–264 (1979)—must pay the statutory benefits regardless of fault, but is shielded from any further liability to the longshoreman. See 33 U. S. C. §§ 904, 905(a); Norris, *supra*, §§ 4:7–4:10.

The longshoreman also may seek damages in a third-party negligence action against the owner of the vessel on which he was injured, and may do so without forgoing statutory compensation if he follows certain procedures. See *Estate of Cowart* v. *Nicklos Drilling Co.*, 505 U. S. 469 (1992). Section 5(b) provides in relevant part:

> "In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . , and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness

or a breach thereof at the time the injury occurred." 33 U. S. C. § 905(b).

This provision, enacted as part of the extensive 1972 amendments to the Act, effected fundamental changes in the nature of the third-party action. First, it abolished the longshoreman's pre-existing right to sue a shipowner based upon the warranty of seaworthiness, a right that had been established in *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85 (1946). Section 5(b) also eliminated the stevedore's obligation, imposed by *Ryan Stevedoring Co.* v. *Pan-Atlantic S. S. Corp.,* 350 U. S. 124 (1956), to indemnify a shipowner, if held liable to a longshoreman, for breach of the stevedore's express or implied warranty to conduct cargo operations with reasonable safety. See generally *Scindia Steam Nav. Co.* v. *De los Santos,* 451 U. S. 156, 165 (1981); G. Gilmore & C. Black, Law of Admiralty § 6–57, pp. 449–455 (2d ed. 1975) (hereinafter Gilmore & Black). Other sections of the 1972 amendments provided for a substantial increase in the statutory benefits injured longshoremen are entitled to receive from their stevedore-employers. See *Northeast Marine Terminal Co.* v. *Caputo,* 432 U. S. 249, 261–262 (1977); Gilmore & Black § 6–46, at 411; Note, 13 Tulane Mar. L. J. 163, 163–164 (1988). The design of these changes was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer. See *Scindia Steam,* 451 U. S., at 171. Subjecting vessels to suit for injuries that could be anticipated and prevented by a competent stevedore would threaten to upset the balance Congress was careful to strike in enacting the 1972 amendments.

The question whether Howlett produced evidence sufficient to hold Birkdale liable for his injuries turns on the meaning of the term "negligence" in § 5(b). Because Congress did not "specify the acts or omissions of the vessel that would constitute negligence," the contours of a vessel's duty to longshoremen are "left to be resolved through the 'appli-

cation of accepted principles of tort law and the ordinary process of litigation.'" *Id.*, at 165–166.

The starting point in this regard must be our decision in *Scindia Steam,* which outlined the three general duties shipowners owe to longshoremen. The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. See *id.*, at 167. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." *Ibid.* The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore. See *id.*, at 167–178.

The allegations of Howlett's complaint, and the facts adduced during pretrial proceedings, implicate only the vessel's turnover duty. We provided a brief statement of the turnover duty in *Federal Marine Terminals, Inc.* v. *Burnside Shipping Co.,* 394 U. S. 404 (1969): A vessel must "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property." *Id.*, at 416–417, n. 18 (internal quotation marks omitted); see also *Scindia Steam,* 451 U. S., at 167. A corollary to the turnover duty requires the vessel to warn the stevedore "of any hazards on the ship or with respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably

competent in the performance of his work." *Ibid.*, citing *Marine Terminals, supra,* at 416, n. 18. Although both components of the turnover duty are related in various respects, Howlett confines his case to an allegation that Birkdale failed to warn that the tween deck was covered with plastic rather than (as is ordinarily the case) paper and plywood.

Most turnover cases brought under § 5(b) concern the condition of the ship itself or of equipment on the ship used in stevedoring operations. See, *e. g., Bjaranson* v. *Botelho Shipping Corp., Manila,* 873 F. 2d 1204 (CA9 1989) (no handhold on coaming ladder); *Griffith* v. *Wheeling-Pittsburgh Steel Corp.,* 610 F. 2d 116 (CA3 1979) (defective hatch covers), remanded, 451 U. S. 965, reinstated, 657 F. 2d 25 (CA3 1981), cert. denied, 456 U. S. 914 (1982); *Scalafani* v. *Moore McCormack Lines, Inc.,* 388 F. Supp. 897 (EDNY) (no handrail on platform linking gangway and deck), aff'd without opinion, 535 F. 2d 1243 (CA2 1975). The turnover duty to warn, however, may extend to certain latent hazards in the cargo stow. This is so because an improper stow can cause injuries to longshoremen, see, *e. g., Atlantic & Gulf Stevedores, Inc.* v. *Ellerman Lines, Ltd.,* 369 U. S. 355 (1962); *Ryan Stevedoring Co.* v. *Pan-Atlantic S. S. Corp.,* 350 U. S. 124 (1956); *Clay* v. *Lykes Bros. S. S. Co.,* 525 F. Supp. 306 (ED La. 1981); *The Etna,* 43 F. Supp. 303 (ED Pa. 1942), and thus is among the "hazards on the ship" to which the duty to warn attaches. *Scindia Steam,* 451 U. S., at 167.

The precise contours of the duty to warn of latent hazards in the cargo stow must be defined with due regard to the concurrent duties of the stevedore and to the statutory scheme as a whole. It bears repeating that the duty attaches only to latent hazards, defined in this context as hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations. In addition, the vessel's duty to warn is confined to latent hazards that "are known to the vessel or should be

known to it in the exercise of reasonable care." *Ibid.* Absent actual knowledge of a hazard, then, the duty to warn may attach only if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence. See *Kirsch* v. *Plovidba,* 971 F. 2d 1026, 1029 (CA3 1992) ("[T]he shipowner's duty to warn the stevedore of hidden dangers necessarily implies a duty to inspect to discover those dangers").

Howlett, relying upon the Restatement (Second) of Torts § 412 (1965), maintains that a vessel's obligations in this regard are broad. Section 412 provides that an owner of land or chattels who hires an independent contractor must take reasonable steps to "ascertain whether the land or chattel is in reasonably safe condition after the contractor's work is completed." In light of this provision, Howlett argues that "a shipowner, who has hired an independent contractor stevedore to perform the work of loading cargo aboard its ship, has a duty to make 'reasonable' (not continuous) inspections" during and after cargo operations to discover dangerous conditions in the stow. Brief for Petitioner 27.

We decline to adopt Howlett's proposal. As an initial matter, we repeat our caveat that the Restatement's land-based principles, "while not irrelevant, do not furnish sure guidance" in maritime cases brought under § 5(b). *Scindia Steam,* 451 U. S., at 168, n. 14. On a more fundamental level, Howlett's contention that a vessel must make reasonable inspections, both during and after stevedoring operations, to discover defects in the stow contradicts the principles underlying our decision in *Scindia Steam.* The plaintiff longshoreman in *Scindia Steam,* injured by cargo that fell from a defective winch, alleged that the shipowner should have intervened in the stevedoring operations and repaired the winch before permitting operations to continue. The case thus turned not upon the turnover duty but upon the scope of the vessel's duty to intervene once cargo operations have begun. We held that the duty to intervene, in the event the

vessel has no knowledge of the hazardous condition, is limited: "[A]bsent contract provision, positive law, or custom to the contrary," a vessel "has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id.*, at 172.

The rule relieving vessels from this general duty rests upon "the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of the cargo operations." *Ibid.*; see also *Hugev v. Dampskisaktieselskabet Int'l*, 170 F. Supp. 601, 609–610 (SD Cal. 1959), aff'd *sub nom. Metropolitan Stevedore Co. v. Dampskisaktieselskabet Int'l*, 274 F. 2d 875 (CA9), cert. denied, 363 U. S. 803 (1960). These expectations derive in part from § 41 of the Act, 33 U. S. C. § 941, which requires the stevedore, as the longshoreman's employer, to provide a "reasonably safe" place to work and to take safeguards necessary to avoid injuries. *Scindia Steam*, 451 U. S., at 170. The expectations also derive from indemnity cases decided prior to the 1972 Act, which teach that "the stevedore [is] in the best position to avoid accidents during cargo operations" and that "the shipowner [can] rely on the stevedore's warranty to perform competently." *Id.*, at 171, citing *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U. S. 315 (1964); see also 451 U. S., at 175 (safety is "a matter of judgment committed to the stevedore in the first instance"). The stevedore's obligations in this regard may not be diminished by transferring them to the vessel.

Given the legal and practical realities of the maritime trade, we concluded in *Scindia Steam* that imposing a duty upon vessels to supervise and inspect cargo operations for the benefit of longshoremen then on board would undermine Congress' intent in § 5(b) to terminate the vessel's "automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore," *id.*, at 168,

and to foreclose liability "based on a theory of unseaworthiness or nondelegable duty," *id.*, at 172. Agreeing with the Court, Justice Powell further observed that imposing such a duty—in light of the stevedore-employer's right to receive reimbursement for its payment of statutory compensation if a longshoreman prevails in a § 5(b) action against a vessel, see *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U. S., at 269–270—would "decrease significantly the incentives toward safety of the party in the best position to prevent injuries." *Scindia Steam, supra,* at 181 (concurring opinion); see also *Edmonds, supra,* at 274 (BLACKMUN, J., dissenting). It is also worth noting that an injured longshoreman's acceptance of statutory compensation operates as an assignment to the stevedore-employer of the longshoreman's right to bring suit against the vessel, so long as the longshoreman does not sue within six months of accepting compensation. 33 U. S. C. § 933(b). Were we to have accepted the longshoreman's contentions in *Scindia Steam,* we would have run the risk of promoting the kind of collateral litigation between stevedores and vessels (albeit in a different guise) that had consumed an intolerable amount of litigation costs prior to the 1972 Amendments. See Gilmore & Black § 6–46, at 411.

The foregoing principles, while taken from *Scindia Steam*'s examination of the vessel's duty to intervene, bear as well on the nature of the vessel's turnover duty, and hence on the case before us. We consider first Howlett's view that a vessel must make reasonable inspections during stevedoring operations to ensure a proper stow and to detect any hazards or defects before they become hidden. The beneficiaries of this proposed duty would be longshoremen who unload or otherwise deal with the cargo at later ports. But if, as we held in *Scindia Steam,* a vessel need not supervise or inspect ongoing cargo operations for the benefit of longshoremen then on board, it would make little sense to impose the same obligation for the benefit of longshoremen at subse-

quent ports. In practical effect, then, adopting Howlett's proposal would impose inconsistent standards upon shipowners as to different sets of longshoremen, and would render much of our holding in *Scindia Steam* an empty gesture.

These concerns are mitigated somewhat when a longshoreman, such as Howlett, works on cargo stowed in a foreign port and undisturbed by longshoremen in a prior American port of call. Foreign longshoremen are not covered by the Act, so requiring vessels to supervise and inspect a foreign stevedore's ongoing operations would not be inconsistent with the precise rule laid down in *Scindia Steam*. This consideration, however, does not support imposing broader duties upon vessels to inspect cargo loading operations in foreign ports. It is settled maritime custom and practice that the stevedore exercises primary control over the details of a cargo operation, see *Oregon Stevedoring, supra,* at 322–323, and we are given no reason to believe that this is any less true in foreign ports than in domestic ports.

That is not to say, of course, that the vessel and its crew remain detached from cargo operations altogether. Most vessels take responsibility, for instance, for preparing a stowage plan, which governs where each cargo will be stowed on the ship. See generally C. Sauerbier & R. Meurn, Marine Cargo Operations 217–239 (2d ed. 1985). But it is the stevedore, an independent contractor hired for its expertise in the stowage and handling of cargo, that is charged with actual implementation of the plan. To impose a duty upon vessels to exercise scrutiny over a cargo loading operation to discover defects that may become hidden when the stow is complete would require vessels to inject themselves into matters beyond their ordinary province. See Williams, Shipowner Liability for Improperly Stowed Cargo: Federal Courts at Sea on the Standard of Care Owed to Off-Loading Longshoremen, 17 Tulane Mar. L. J. 185, 198–199 (1993); contra *Turner* v. *Japan Lines, Ltd.,* 651 F. 2d, at 1304 (vessel "can ensure safety by choosing a reliable foreign stevedore

[and] supervising its work when necessary"). The proposed rule would undermine Congress' intent in § 5(b) to eliminate the vessel's nondelegable duty to protect longshoremen from the negligence of others. See *Scindia Steam*, 451 U. S., at 168–169.

We next consider Howlett's view that a vessel must make reasonable inspections after the completion of stevedoring operations to discover hazards in the stow. There is good reason to doubt that adopting this rule would have much practical import. Any hazard uncovered by a shipowner who inspects a completed stow would, as a matter of course, be discovered in a subsequent port by a stevedore "reasonably competent in the performance of his work." *Id.*, at 167. As discussed above, shipowners engage a stevedore for its expertise in cargo operations and are entitled to assume that a competent stevedore will be able to identify and cope with defects in the stow. See *id.*, at 171; *Hugev* v. *Dampskisaktieselskabet Int'l*, 170 F. Supp., at 609–610. Once loading operations are complete, it follows that any dangers arising from an improper stow would be "at least as apparent to the [stevedore] as to the [shipowner]." *Atlantic & Gulf Stevedores, Inc.* v. *Ellerman Lines, Ltd.*, 369 U. S., at 366 (Stewart, J., dissenting). Because there can be no recovery under § 5(b) for a vessel's failure to warn of dangers that would be apparent to a longshoreman of reasonable competence, *Scindia Steam, supra,* at 167, nothing would be accomplished by imposing a duty upon vessels to inspect the stow upon completion of cargo operations. That is reason enough to reject it.

For the purposes of delineating the scope of a shipowner's turnover duty, then, the cargo stow is separate and distinct from other aspects of the ship. When between ports, the vessel and its crew have direct access to (and control over) the ship itself and its gear, equipment, and tools. The vessel's responsibilities to inspect these areas of the ship are commensurate with its access and control, bearing in mind,

of course, that negligence, rather than unseaworthiness, is the controlling standard where longshoremen are concerned. Because the vessel does not exercise the same degree of operational control over, and does not have the same access to, the cargo stow, its duties with respect to the stow are limited by comparison. See *Robertson* v. *Tokai Shosen K. K.*, 655 F. Supp. 152, 154 (ED Pa.), aff'd, 835 F. 2d 490 (CA3 1987), cert. denied, 486 U. S. 1007 (1988).

In sum, the vessel's turnover duty to warn of latent defects in the cargo stow and cargo area is a narrow one. The duty attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work. *Scindia Steam*, 451 U. S., at 167. Furthermore, the duty encompasses only those hazards that "are known to the vessel or should be known to it in the exercise of reasonable care." *Ibid.* Contrary to Howlett's submission, however, the exercise of reasonable care does not require the shipowner to supervise the ongoing operations of the loading stevedore (or other stevedores who handle the cargo before its arrival in port) or to inspect the completed stow.

### III

We turn to the proper disposition of this case. As the Court of Appeals did not issue an opinion, we have before us only the District Court's statement of its reasons for granting summary judgment in favor of Birkdale. The vessel having been under no obligation to supervise and inspect the cargo loading operations, and no other theory for charging the vessel with constructive knowledge having been advanced, the District Court was correct to inquire whether the vessel had actual knowledge of the tween deck's condition. The District Court found it undisputed that there was no actual knowledge. At this stage of the proceedings, however, we cannot conclude that summary judgment can rest on this ground. There is sufficient evidence in the record

to support a permissible inference that, during the loading process, some crew members, who might have held positions such that their knowledge should be attributed to the vessel, did in fact observe the plastic on the tween deck. And the District Court's alternative theory that even if some crew members were aware of the condition during loading operations, then the condition also would have been open and obvious to a stevedore during unloading operations, may prove faulty as well, being premised on the state of affairs when the vessel took on cargo, not during discharge at the port where Howlett was injured.

All this does not mean that the vessel is not entitled to summary judgment. Howlett's own witnesses stated that the plastic was visible, even from the top deck, during unloading operations. Howlett must overcome these submissions, for even assuming the vessel had knowledge of the tween deck's condition, he must further demonstrate that the alleged hazard would have been neither obvious to nor anticipated by a skilled and competent stevedore at the discharge port. This contention, however, was not addressed by the District Court and was not explored in detail here. We think it the better course to remand the case to the Court of Appeals so that it, or the District Court, can address in the first instance these and other relevant points upon a review of the entire record made in support of the vessel's motion for summary judgment.

For these reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*