Charles W. **DEYERLE, Jr.,**
**Plaintiff–Appellee,**

v.

**UNITED STATES of America,**
**Defendant–Appellant.**

Charles W. **DEYERLE, Jr.,**
**Plaintiff–Appellant,**

v.

**UNITED STATES of America,**
**Defendant–Appellee.**

Nos. 97–2139, 97–2223.

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1998.

Decided July 17, 1998.

**ARGUED:** David Vernon Hutchinson, Assistant Director, Admiralty Section, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for Appellant. Melvin J. Radin, Norfolk, Virginia, for Appellee. **ON BRIEF:** Frank W. Hunger, Assistant Attorney General, Helen F. Fahey, United States Attorney, George M. Kelley, III, Assistant United States Attorney, Joseph C. Misenti, Jr., Trial Attorney, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for Appellant.

Before ERVIN and LUTTIG, Circuit Judges, and BUTZNER, Senior Circuit Judge.

Reversed by published opinion. Judge LUTTIG wrote the opinion, in which Judge ERVIN and Senior Judge BUTZNER joined.

## OPINION

LUTTIG, Circuit Judge:

The United States, as shipowner, hired an independent contractor—Xeno Technix—to make repairs and alterations to the computer room of the USS Saipan, which was in dry-dock at the Norfolk Naval Shipyard for repair. J.A. at 32. As part of its contract with the United States, Xeno was to remove and replace the ventilation ductwork (including vent covers) and the computer cables. J.A.

at 32. The ductwork and computer cables were attached to the computer room's ceiling. The United States turned control of the computer room over to Xeno for the repairs and temporarily relocated the computer operations and the navy personnel who normally worked in the computer room to a location on the adjacent pier. J.A. at 32, 36. Xeno had full control over the repairs and Xeno's employees were not supervised by the United States. J.A. at 32, 36.

During the course of the repairs, Xeno assigned plaintiff-appellee, Charles Deyerle, and two coworkers to remove power cables that ran across the ceiling. Deyerle stood on a platform to reach the cables and removed them by pulling on them until they came down. J.A. at 32. One particular cable was difficult to dislodge, so he pulled on it several times until it suddenly came free. J.A. at 33. The resulting momentum caused his right hand to swing up above his head, where his hand and wrist struck a vent cover, J.A. at 33, which was attached to the ventilation ductwork running along the ceiling about 10 to 15 inches above Deyerle's head, J.A. at 66–68. The impact injured Deyerle's hand, transecting the radial nerve going to the thumb. J.A. at 33. Immediately after the accident, Deyerle looked up and saw a sharp corner of the vent cover, J.A. at 37–38, 69–70, which apparently caused his injury.

Deyerle thereafter brought suit against the United States under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 910–950, to recover for his injury. Under the LHWCA, as amended in 1972, a shipowner

> owes to the stevedore and his longshoremen employees the *duty of exercising due care "under the circumstances."* This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel

or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

*Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 166–67, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) (emphasis added). This "turnover duty" thus requires that the shipowner exercise due care to ensure that the ship is safe enough when turned over to the stevedore to allow the stevedore, exercising reasonable care, to perform cargo operations safely, and that the stevedore be warned of any hidden defects that are known or should be known to the shipowner.[1] *See id.* (shipowner is negligent "if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care"). The district court found that the United States had breached its turnover duty to Xeno and Xeno's employees, J.A. at 36–38, and thus was liable to Deyerle for his injuries.

Xeno was not, however, a stevedore conducting cargo operations on the ship, but rather a repair contractor hired specifically to replace and repair the very equipment on which Deyerle was injured. To hold a shipowner liable to repairmen for injuries resulting from the very equipment they have been hired to repair would, in many cases, effectively render the shipowner an insurer of all repair operations, a result that Congress clearly did not intend by its 1972 Amendments to the LHWCA, which were designed to eliminate the essentially strict liability regime of "seaworthiness" and to establish a negligence regime. *See Scindia,* 451 U.S. at 165, 101 S.Ct. 1614. Moreover, what constitutes reasonable care "under the circumstances" is obviously quite different when the contractor is hired to repair the ship and its

equipment than when the contractor is hired simply to stow and transport cargo. The Supreme Court recognized precisely this distinction in *West v. United States,* 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), when it held that the shipowner in that case had no duty "to exercise reasonable care to furnish a safe place to work," because the shipowner had no control over the vessel being repaired and no power to supervise or control the repair work, and the water system that injured the plaintiff had no "hidden defect" and "was one of the objects to be repaired." *Id.* at 123, 80 S.Ct. 189 (describing the risks from the water system as "inherent in the carrying out of the contract"). Indeed, the Court noted that "[i]t appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe." *Id.*

Similarly, here, the United States had completely surrendered control of the computer room to Xeno for repairs and did not supervise or control the repairs.[2] Thus, Xeno (or its employees)—not the United States—chose the method of removing the computer cables that resulted in Deyerle's injury. Had Xeno instructed its employees to use a safer method for removing the cables than brute physical force or instructed its employees to remove the vent covers before pulling the cables down, Deyerle's injury could have been avoided. Accordingly, Xeno was clearly in a "better position than [the United States] to avoid the accident," *Scindia,* 451 U.S. at 171, 101 S.Ct. 1614 (quoting *Italia Societa v. Oregon Stevedoring Co.,* 376 U.S. 315, 322–23, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964)), and it would make little sense to hold the United States liable for Deyerle's injuries.

■ Of course, this is not to say that a shipowner could never be liable to an independent-contractor employee injured by the

1. The LHWCA also imposes other duties on shipowners, but only the "turnover duty" is at issue here. J.A. at 36.

2. Of course, the shipowner in *West* had turned over the entire vessel to the contractors for extensive repair work throughout the ship. How-

ever, the rationale in *West* is equally applicable to more limited repair work when it is the object to be repaired or replaced that injures the worker and the shipowner has surrendered control of the area and the relevant repairs to the independent contractor.

equipment that the contractor was hired to repair. Where the defect was not "obvious" to the contractor or would not reasonably be "anticipated" by a competent contractor, *Scindia*, 451 U.S. at 166–67, 101 S.Ct. 1614, but was instead "hidden," or, "latent," the shipowner would still have a duty to warn the contractor if it knew about the defect or would have discovered it if it had exercised reasonable care. *Id.* at 167, 101 S.Ct. 1614; *see also West*, 361 U.S. at 124, 80 S.Ct. 189 (recognizing that the shipowner might be negligent where it failed to disclose "hidden or inherent defects").

The defect at issue in this case, however, was obvious and easily seen by anyone working in the area and exercising due care in doing so, and, in any event, should have been anticipated by an expert repairman hired to replace and repair the ventilation system and its vent covers. The district court's contrary conclusion is belied by its own explicit finding that Deyerle was contributorily negligent, in part, for not undertaking a proper inspection of the workplace prior to tugging on the cables, J.A. at 26,—presumably because, if he had, he would have seen the sharp vent

corner and been more careful when removing the cables.[3] *Cf.Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 105, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994) (holding that duty to warn attaches only to "latent hazards" that "would be neither obvious to nor anticipated by a *skilled* stevedore in the *competent performance of its work* "); *Scindia*, 451 U.S. at 167, 101 S.Ct. 1614 (same). Deyerle himself testified that immediately after his accident, he looked up and saw the sharp corner of the vent cover, J.A. at 37–38, 69–70. *See also* J.A. at 38 (district court noting that the sharp edge was "visible upon close examination"). Moreover, common sense indicates that sharp corners are precisely the type of hazard that one hired to repair vent ducts in a metal ship should reasonably expect to encounter in the course of his duties.[4] J.A. at 82. And, indeed, when Xeno's team leader was asked whether he expected his workers to encounter sharp edges on the ventilation ductwork, he replied that "in any space like that [computer room], there's sharp objects because it's a metal ship, and everything in there is metal." J.A. at 83.[5]

---

**3.** Even appellee implicitly acknowledges the tension between the district court's conclusion that Deyerle was contributorily negligent for failing to inspect the area properly before beginning his work and its conclusion that the defect was latent and should not have been anticipated by Deyerle. *See* Appellee's Brief at 12.

**4.** The district court apparently distinguished between "normal" sharp edges and the "jagged curved edge" of the vent cover, as described by Deyerle. J.A. at 38 ("While there was some testimony that one might expect to encounter thin edges of sheet metal while disassembling duct work, one would not anticipate the jagged, curved edge encountered by the plaintiff."); *see also* Appellee's Brief at 9 (recounting the district court's finding that plaintiff was not required to anticipate the vent cover's sharp corner "because it was not the *type* of sharp edge one would expect to encounter") (emphasis added). However, plaintiff need not have anticipated the exact kind of sharp edge that would injure him in order to have avoided his accident through the exercise of due care. A "jagged curved edge" is but a subset of the class of hazards (sharp edges) that plaintiff should have anticipated and planned for in his work.

**5.** Even if the district court correctly concluded that the sharp corner of the vent cover was a latent defect, we would still be reluctant to sustain its imposition of liability on the United

States because the district court failed to make any finding that the United States knew—or should have known—of the sharp corner of the vent cover or that the sharp corner would be a hazard to Xeno's employees. *See Scindia*, 451 U.S. at 167, 101 S.Ct. 1614; *Howlett*, 512 U.S. at 105, 114 S.Ct. 2057 (duty to warn encompasses "only those hazards that are known to the vessel or should be known to it in the exercise of reasonable care"). Indeed, the district court apparently never considered whether the United States knew of the defect or was chargeable with such knowledge. J.A. at 37 (holding that the plaintiff had to prove only that the sharp edge existed at the time of turnover and that the sharp edge was not the type of hazard that Xeno's workers should have expected to encounter in the performance of their duties); J.A. at 25 (same). And appellee has not cited any evidence in the record that would support such a finding.

> Rather, appellee cites only to the district court's statement that
>> the plaintiff believes that this vent cover was indeed—did have this corner that was sticking out, that that is a condition that the ship owner should have warned the plaintiff's employer of.

Appellee's Brief at 12. Although appellee contends that this is a factual finding by the district court that the United States knew or should have known that the defect would be a hazard to Xeno, in fact the court's statement merely recites

For the foregoing reasons, the judgment of the district court is reversed, and the cross-appeal is dismissed as moot.

*REVERSED.*

plaintiff's argument, and, in any event, it evinces no awareness that the duty to warn arose only if the United States knew or should have known of the defect.