Kathy Payne DEARMOND, individually and as administrator of the estate of John G. DeArmond and as parent and guardian of James Daniel DeArmond, and Jamie Nichole DeArmond, Plaintiffs–Appellees,

v.

SOUTHWIRE COMPANY, Defendant–Appellant,

No. 02–5818.

United States Court of Appeals, Sixth Circuit.

Aug. 24, 2004.

Rehearing En Banc Denied Oct. 28, 2004.

Larry Brent Yonts, Greenville, KY, James M. Gary, Weber & Rose, Louisville, KY, Frank Miller, Jr., Frankfort, KY, for Plaintiffs–Appellees.

John L. Tate, Julie M. McDonnell, Stites & Harbison, Edward H. Stopher, Raymond G. Smith, Boehl, Stopher & Graves, Louisville, KY, for Defendant–Appellant.

David R. Monohan, Woodward, Hobson & Fulton, Louisville, KY, for Defendant–Appellee.

Before DAUGHTREY and COLE, Circuit Judges, and POLSTER,* District Judge.

PER CURIAM.

This diversity action was filed by plaintiff Kathy DeArmond, whose husband suffered fatal head injuries when he fell from a barge on which he was working in his capacity as a longshoreman for the defendant, Southwire Company. Although Southwire conceded its liability as an employer under the no-fault provisions of

---

* The Hon. Daniel Aaron Polster, United States District Court for the Northern District of Ohio, sitting by designation.

§ 904(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (2001) (the Act), the plaintiff claimed that Southwire was also liable under § 905(b)'s "dual capacity" provision because it was the *pro hac vice* owner of the barge that her husband had been unloading when he fell. The barge was actually owned by American Commercial Barge Line ("American Barge"), which had contracted with Southwire to deliver raw materials to its aluminum processing plant. After first granting the defendant's motion for summary judgment on the question of "dual capacity" liability under § 905(b), the district court later vacated that order without further explanation and allowed the case to go to trial. The result was a jury verdict in the plaintiff's favor against Southwire for $3.595 million that included punitive damages.

The defendant contends on appeal that it was entitled to judgment in its favor as a matter of law, that a jury instruction on imputed knowledge was legally erroneous, and that the award of punitive damages was improper. Because we hold that the original order granting summary judgment to the defendant should not have been vacated, we reverse the judgment of the district court and enter judgment for the defendant.

## FACTUAL AND PROCEDURAL BACKGROUND

At the time of the events giving rise to this litigation, Southwire operated an aluminum smelter located on the Ohio River at Owensboro, Kentucky. The smelting process required a constant flow of raw materials, which were delivered to Southwire's river terminal by American Barge, under contract to Southwire to haul alumina and coke from Louisiana to the Kentucky facility. When the barges arrived, they were tied to a drop-off cell some 30 or 40 feet from the terminal and remained there until a Southwire tugboat maneu-

vered them, one at a time, into place at the dock. Once there, a large-scale vacuum unloader would suction the cargo out of the barge and deposit it on a conveyor belt running directly into the smelter.

On the day he died, John DeArmond, a relatively new Southwire longshoreman, was in the process of unloading one of the barges positioned at the dock when he lost his balance and fell approximately 18 feet from his position on the hatch cover into an empty cargo hold. A later investigation indicated that a locking pin used to secure the hatch cover had broken, causing the cover to slide unexpectedly. There was also evidence that the break was caused because Southwire was utilizing an unadvisable method of securing the barge covers that placed excessive stress on the locking pins, causing them to break "every once in a while." In fact, after monitoring Southwire's stevedore operation, American Barge had warned that the unloading procedure was unsafe and was causing damage to the barges. However, Southwire took the position that it could not change its unloading method because of the design of the dock.

On behalf of her husband's estate, the plaintiff filed suit against Southwire as a vessel owner *pro hac vice* and against American Barge as the actual vessel owner. The district court initially granted Southwire summary judgment, based on its conclusion that Southwire was not the vessel owner *pro hac vice* as a matter of law. However, after hearing argument on the plaintiff's motion to alter or amend, the district court vacated its summary judgment order, for reasons that are not clear, and set the case for trial against both Southwire and American Barge. The jury that heard the case exonerated American Barge but found that Southwire was a "vessel" (as defined in the jury instructions) and that "Southwire violated its ac-

tive control duty" and "its duty to intervene," resulting in the death of John DeArmond. The jury fixed compensatory damages at $1.095 million and also imposed punitive damages in the amount of $2.5 million, resulting in an award of $3.595 million.

Posttrial, the district court denied the defendant's motion for judgment as a matter of law, and this appeal followed.

## DISCUSSION

The Longshore and Harbor Workers' Compensation Act "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries" occurring on the navigable waters of the United States. *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 96, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994). In 1972, the Act was amended to increase the statutory benefits for injured longshoremen and to shift more responsibility for compensation to the party best able to prevent the injuries: the stevedore-employer. *See Howlett*, 512 U.S. at 97, 114 S.Ct. 2057. As with most workers' compensation programs, an employer must pay statutory benefits regardless of fault but is shielded from further liability. *See id.*; 33 U.S.C. §§ 904, 905(a).

The Act does provide one exception to the exclusive-remedy provision in § 905(a). Under § 905(b), a longshoreman may also seek damages from a third-party in a negligence action against the owner of a vessel on which the employee is injured. "Thus, in the typical tripartite situation, the longshoreman is not only guaranteed the statutory compensation from his employer; he may also recover tort damages if he can prove negligence by the vessel. The second sentence of § [90]5(b) makes it clear that such a separate action is authorized against the vessel even when there is no

independent stevedore and the longshoreman is employed directly by the vessel owner." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 530, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). When the stevedore operation and the vessel are alleged to be one and the same entities, such as Southwire was in this case, the arrangement is commonly referred to as a "dual capacity" case. *See Gravatt v. City of New York*, 226 F.3d 108, 121 (2nd Cir. 2000). However, as the defendant notes, the "dual capacity" model is aimed principally at shipowners who run their own stevedoring operation, a reasonably frequent occurrence. That, of course, was not the situation here.

The plaintiff nevertheless argued to the district court that this case should be treated as a "dual capacity" situation, contending that Southwire was an owner *pro hac vice* of the barge in question or, alternatively, that there were questions of disputed fact from which a jury could find that Southwire was an owner *pro hac vice* of the barge. The district court, in a well-reasoned opinion, rejected both arguments, finding first that there was no dispute about the facts, which were "known and . . . not in dispute." The court concluded, "The only unknown at this point is what legal conclusion will be drawn from the undisputed facts." What followed was a masterful analysis of the pertinent legal principles governing the maritime concept of *pro hac vice* ownership:

> Although "owner pro hac vice" is not defined in the [Longshore and Harbor Workers' Compensation Act], courts have set forth the governing legal principles:
>
>> An owner pro hac vice is one who assumes by charter or otherwise "exclusive possession, control, command, and navigation" of a vessel for a specified period of time. An owner pro hac

vice "has complete—though perhaps only temporary—dominion over the vessel entrusted to him. He commands her navigation and is entitled to avail himself fully of her services." "It is therefore tantamount to, though just short of, an outright transfer of ownership."

*Bernier v. Johns–Manville Sales Corp.,* 547 F.Supp. 389, 394 (D.Me.1982) (citations omitted). Other courts have stated that

> [f]or [pro hac vice] ownership to be found, it is generally necessary for the defendant's relationship to be that of shipowner-bareboat charterer. Such a relationship is materially different from that of a shipowner-shiprepairer or shipowner-stevedore. "[T]he charterer takes over the ship, lock, stock and barrel, and mans her with his own people. He becomes ... the owner pro hac vice, just as does the lessee of a house and lot, to whom the demise charterer is analogous."

*Bossard v. Port Allen Marine Service, Inc.,* 624 F.2d 671, 672–73 (5th Cir.1980) (citations omitted).

> There are three principal forms of charters:
> (1) Under a time charter, the charterer engages for a fixed period of time a vessel, which remains manned and navigated by the vessel owner, to carry cargo wherever the charterer instructs; (2) under a voyage charter, the charterer engages the vessel to carry goods only for a single voyage; and (3) under a demise, or bareboat charter, the charterer takes complete control of the vessel, mans it with his own crew, and is treated by the law as its legal owner.

2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 11–1 (3d ed.2001). The demise or bareboat charter transfers full possession and control of a vessel for the period of time designated by the contract. *Id.* § 11–3.

Generally speaking, the cases hold that those who exercise control over a vessel for a particular purpose such as repairing, cleaning or unloading are not considered to be owners pro hac vice. This is so because they have not been granted complete dominion and control over the vessel. Although they control, command and navigate the vessel while it is in their possession to accomplish the designated task, the owner of the vessel has not relinquished complete dominion and control of the vessel tantamount to a demise of the vessel. "[A]nything short of such a complete transfer is a time or voyage charter party or not a charter party at all." *Olsen v. Todd Shipyards Corp.,* 435 F.Supp. 568, 570 (W.D.Wash. 1977) (citing *Guzman v. Pichirilo,* 369 U.S. 698, 699–700, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962)). If Southwire had hired a stevedore to unload the barge and the stevedore exercised the exact same control and dominion over the barge as did Southwire, and accomplished the unloading in exactly the same manner, the Court would have no hesitation in concluding, under well-established maritime law, that the stevedore was not an owner pro hac vice.

The district court concluded that "[u]nder the facts of this case, it is clear that all of Southwire's 'controlled movements of the barge were simply incidental to the ... [un]loading of the vessel,' (quoting *Ducote v. International Operating Co.,* 678 F.2d 543, 546 (5th Cir.1982))."

The court further noted that a reading of the relevant case law indicated that "the pivotal question is whether Southwire had the right to use the barge for its own purposes in maritime commerce" and looked to the contract between Southwire and American Barge to determine the an-

swer. That contract, of course, required American Barge to deliver barge-loads of alumina and calcined coke to Southwire's river terminal and specified that:

Nothing herein contained shall be construed as a contract by [Southwire] for chartering, hiring or leasing of any barge, towboat or other equipment of [American Barge], nor shall any of the agents, servants or employees of [American Barge] be regarded as employees of [Southwire], it being understood that [American Barge] is in all respects an independent contractor and that [Southwire] shall exercise no control over such barges, towboats or other equipment or the agents, servants or employees of [American Barge].

We agree with the district court's conclusion that '[i]t is readily apparent from this language that [the parties] did not intend for Southwire to exercise the type of dominion and control that would allow Southwire the ability to use the barge in its commercial activity for any purpose. Southwire's use was limited to unloading the barge and returning it." The court further found that the parties to the contract "recognized the concept of charters and the fact that the existence of certain types of charters would cause Southwire to be[come] liable under § 905(b). The contract language makes it clear that [they] did not intend for Southwire to face such liability."

Responding to the plaintiff's argument that the provisions of the contract could not be taken as conclusive, the district court also looked to the undisputed facts in the record and noted:

Southwire's dominion over [the barge] was limited, contractually and factually, to the narrow sphere of unloading alumina or calcined coke from the barge. Southwire was not authorized to use the barge for any other purpose than moving it to and from the dock and unload-ing the raw materials. Southwire had no right to utilize the barge for any other service that would qualify as being "tantamount to, though just short of, an outright transfer of ownership." Southwire could not take the barge any farther that the confines of its dock area. Furthermore, Southwire could not load the barge with anything else that it may have needed to transport.

Given that "courts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship," *Olsen*, 435 F.Supp. at 570, the Court concludes that Southwire did not have the "ability" to use the barge in its commercial enterprise other that the ability to use it as the contract provided. Such use was very limited and far less that one would enjoy if granted complete and exclusive possession and control just short of an outright transfer of ownership. From the undisputed facts, and for the foregoing reasons, the Court finds as a matter of law that Southwire's motion for summary judgment should be granted.

We agree with this conclusion. The only mystery is what ensued at the hearing on the plaintiff's motion to alter or amend that persuaded the district court to take a 180–degree turn and vacate the summary judgment. The only two pages from the transcript of the hearing that were provided in the joint appendix suggest that because the district judge had denied summary judgment to American Barge, thus necessitating a trial on the question of its liability to the decedent's estate, he "put [Southwire] back in this case," saying that he had decided "to take the cards [coward's?] way out" and "let the 6th Circuit review" the legal question of ownership *pro hac vice*. Having taken a close look, we think it is abundantly clear that, in the vernacular, the district judge got it right

the first time and should have stuck to his guns.

## CONCLUSION

Because the undisputed facts indicate that Southwire was not the owner *pro hac vice* of the barge on which the plaintiff's decedent was injured, there is no legal basis for the plaintiff's claim of tort liability under 33 U.S.C. § 905(b). It therefore follows that summary judgment was properly entered in favor of the defendant and that the case against it should not have been submitted to the jury. Having reached this decision in favor of Southwire, it becomes unnecessary for us to address the remaining issues raised on appeal.

For the reasons set out above, we RE-VERSE the district court's judgment in favor of the plaintiff and enter judgment for the defendant.