[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-12041
Non-Argument Calendar
_____

D.C. Docket No. 4:17-cv-00211-WTM-CLR

ALBERT PURVIS,

Plaintiff-Appellant,

versus

MAERSK LINE A/S,

Defendant-Appellee.

_____

Appeal from the United States District Court
For the Southern District of Georgia
_____

(January 3, 2020)

Before WILSON, JILL PRYOR and BLACK, Circuit Judges.

PER CURIAM:

Albert Purvis appeals the district court's grant of summary judgment to Maersk Line A/S (Maersk) in Purvis's suit against Maersk alleging negligence under Section 905(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901-950, after Purvis was injured when a hatch cover crashed down on his head while climbing a ladder, causing him to fall to the platform below.  Purvis contends the district court entered summary judgment in error because a material question of fact remained regarding whether the ship breached its turnover duty under *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981), when it left one of its hatch covers in such a condition that it could fall at any time on a longshoreman passing through it.  After review,[1] we affirm the district court's grant of summary judgment to Maersk.

## I.  BACKGROUND

Purvis reported to work on December 30, 2015, at 7:00 p.m. to work the night shift as a lasher unloading the M/V ANNA MAERSK, owned and operated by Maersk, which had just docked at the Port of Savannah.  After Maersk handed the vessel over to the stevedoring company for unloading, Purvis and his fellow

---

[1]  We review "a district court's grant of summary judgment de novo, applying the same legal standards used by the district court." *Galvez v. Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008).  "Summary judgment is appropriate where 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1271 (11th Cir. 2001) (quoting Fed. R. Civ. P. 56(c)).

longshoremen were the first on the ship, and Purvis was "the first to . . . get on the gangway" and "the first one to go up the ladder." Purvis was an officer in his union and gave the safety briefing for the crew that day. Purvis estimated he had worked on the M/V ANNA MAERSK at least ten times.

Purvis was working on the lashing bridge, and in order to get to that bridge Purvis had to climb up the ladder where he was eventually injured. However, Purvis's first climb up the ladder occurred without incident. The "hatch cover," a manhole-like hinged metal cover, was already in the open and upright position, so Purvis did not need to open it when he got near the top of the ladder. Once up the ladder, Purvis began working on the lashing bridge where he was on the same level as the hatch cover and, in the daytime, would likely have been able to see whether the hatch cover was properly latched. However, Purvis was working in the evening and testified that it was dark and poorly lit, so while standing on the lashing platform, he was unable to see whether the latch on the hatch cover was engaged. After working for a while on the lashing bridge, Purvis needed to go down to the main deck to get a tool. In doing so, Purvis went back through the already opened hatch cover and climbed down the ladder.

As Purvis was climbing back up the ladder, the hatch cover was still in the upright or open position. Right when Purvis got to the top of the ladder, the hatch cover came crashing down on his head. The unexpected impact of the hatch cover

3

on Purvis's head caused him to fall to the platform below. Purvis testified, "I just remember looking up and seeing that door coming and hitting me in the face. And then the next thing I know I'm, I'm in the van . . . . And I've got 50 people around me . . . ."

According to the Captain of the M/V ANNA MAERSK, Roy Whelan, opened hatch covers are supposed to be held up by a latch. He stated that generally, when a person climbs up a ladder, the hatch cover above would be closed and the person would push it up and latch it.

Other than Purvis, no one witnessed Purvis's fall. When Purvis was found, he was taken by ambulance to the hospital. As a result of the incident, Purvis sustained spinal cord compression. This condition required a multi-level cervical discectomy and fusion surgery. Also as a result of his neck injury and surgery, Purvis could not work for almost one year. During that time, Purvis experienced both physical pain and unhappiness with being unable to work.

## II.  DISCUSSION

The merits of this case turn on Purvis's rights under 33 U.S.C. § 905(b). The vessel owes the stevedore and her longshoremen employees the duty of reasonable care "under the circumstances." *Scindia*, 451 U.S. at 166-67. The shipowner is entitled to rely on the stevedore "to avoid exposing the longshoremen to unreasonable hazards," and may otherwise expect the stevedore to "perform his

4

task properly without supervision." *Id.* at 170. "[A]bsent contract provision, positive law, or custom to the contrary . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Id.* at 172. However, the Supreme Court set out the limited duties vessel owners owe the stevedore under § 905(b) in *Scindia*. *See Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98 (1994). Shipowners owe the stevedore three distinct duties during cargo operations: (1) the turnover duty, (2) the active control duty, and (3) the duty to intervene. *See id.* On appeal, Purvis alleges Maersk breached the turnover duty.

"The 'turnover duty' relates to the condition of the ship upon the commencement of stevedoring operations." *Id.*

> A vessel must "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property." A corollary to the turnover duty requires the vessel to warn the stevedore "of any hazards on the ship or with respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

*Id.* at 98-99 (alterations in original) (citations omitted).  Purvis advances two theories of how Maersk breached the turnover duty.  First, he contends the hatch cover and latch must have been defective in some way; and second, he asserts a Maersk employee must have opened the hatch cover and failed to latch it.  There is no genuine issue of material fact suggesting Maersk breached the turnover duty under either theory.

As to the defective latch argument, Purvis's evidence consists of a video filmed by his attorney and safety inspection reports.  We agree with the district court's determination that the video showing Purvis's attorney manipulating the hatch cover and latch, resulting in the hatch cover falling on the third manipulation, does not create a genuine issue of material fact that the hatch cover was defective when it injured Purvis.  Assuming, without deciding, that the video is admissible evidence, the video does not provide evidence the hatch cover and latch were defective at the time of Purvis's injury.  First, while Purvis claims the video shows the defective nature of the hatch, there is no accompanying testimony to explain the video—for example, why the hatch cover fell on the third attempt but not the first two or what the alleged defect is.  Second, Purvis was injured on December 30, 2015, and the video was taken on June 5, 2018.  There is no evidence that the hatch cover was in the same condition two and a half years after the accident, and

Purvis cannot testify to the hatch cover's condition in 2015, as he admits he did not visually inspect the hatch cover and latch on the day of the accident.

As to the safety reports noting that certain unidentified hatch locks do not close or lock, there is no evidence that the notes of certain hatch locks not closing or locking on routine maintenance inspections refer to the hatch cover and latch that injured Purvis. In any case, that Maersk noted issues with certain hatch locks in safety reports is not enough evidence to survive summary judgment. There is no evidence the issues noted on the reports were not later repaired or were the same conditions as on January 30, 2015. Simply put, Purvis has no evidence, other than speculation, that the hatch cover and lock were defective on the day of his accident.

As to the argument that a Maersk employee must have left the hatch door open without locking it, Purvis's argument also fails. Even if the hatch door were left in an open and upright position without being latched, Purvis could have remedied that issue when he was on the same level as the door on the lashing bridge and would have been able to see the open hatch door. The condition of an unlatched hatch cover would have been obvious to Purvis as a "reasonably competent" longshoreman, thus precluding recovery for a breach of the turnover duty. *See Hewlett*, 512 U.S. at 98-99. The fact that it was dark does not change the analysis, as a reasonably competent longshoreman could see if the latch was

7

engaged if it was visually inspected.  Purvis testified he had issues with improperly working hatch covers in the past, and if a crew saw a latch that was not working properly, Purvis would get maintenance to fix it or would otherwise address the issue.  Thus, if the hatch door were not latched, it should have been open and obvious to Purvis when he was on the same level as the hatch door, and he, as an experienced longshoreman, could have remedied the potential hazard.

## III.  CONCLUSION

No material question of fact remained regarding whether Maersk breached its turnover duty.  The district court did not err in granting summary judgment to Maersk.

**AFFIRMED.**