846 So.2d 145 (2003)
Michael JOHNSON, Sr. and Kim Johnson Individually and on Behalf of Their Minor Children Monesha Johnson, Kyi Johnson, Kendra Johnson and Monique Johnson
v.
LOUISIANA DOCK COMPANY, L.L.C. and Dann Ocean Towing, Inc.
No. 03-CA-39.
Court of Appeal of Louisiana, Fifth Circuit.
April 29, 2003.
*147 Ronald A. Johnson, Robert L. Pratt, Johnson, Johnson, Barrios & Yacoubian, New Orleans, LA, for Appellant.
Joseph F. LaHatte, Jr., Roderick Alvendia, Roch P. Poelman, New Orleans, LA, for Appellee.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY and SUSAN M. CHEHARDY.
JAMES L. CANNELLA, Judge.
The Defendant, Dann Towing, Inc., appeals from a judgment finding it liable for injuries to the Plaintiff, a longshoreman, Michael Johnson, Sr. We affirm in part, vacate in part and remand.
On August 18, 1998, the Plaintiff was working as a rigger for Louisiana Dock Co., LLC (Louisiana Dock), a tug repair facility located on the Mississippi River. As a rigger, his duties included assisting the crane operator in loading and unloading of equipment, securing and hooking the load to be lifted by the crane, signaling or flagging the crane operator as to where to place the load, and unhooking the items from the crane after the load was set down. The Plaintiff was experienced at the job. On the day of the accident, he was assisting the crane operator, Dan Ochman (Ochman), to load a heavy piece of equipment on the deck of the M/V Captain Dann, an ocean-going tug that had been docked at the facility for several weeks for repairs. The tug was moored to a permanent barge, the Lay Barge 901(901). The load was a "button," "roller," or "kavel," around which lines or rope are wrapped. After the Plaintiff secured the button, it was lifted by crane from the back of a flatbed truck and started to swing toward the tug. The Plaintiff crossed the 901 to reach the vessel to board it so that he could find out where the load was to be deposited and to unhook it. When he reached the tug, he stepped on the bulwark (solid rails that run along the sides of the vessel a few inches wide) and he also stepped on excess lines or rope that had been "flaked" along the bulwark to keep the deck passage clear. The rope rolled, he lost his balance and fell to the deck, a distance of approximately 2 to 3 feet. As a result of his fall the Plaintiff suffered a fractured ankle and fibula, injury to his right knee and psychiatric problems.
The Plaintiff subsequently received workers' compensation from Louisiana Dock. On August 18, 1999, the Plaintiff and his wife, Kim Johnson, filed suit against the Defendant under the provisions of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) (LHWCA). Louisiana Dock intervened to recover the compensation that it had paid to the Plaintiff. A two day judge trial was held on March 25 and 26, 2002, following which, the Defendant was found 75% at fault and the Plaintiff 25% at fault in the accident. The trial judge awarded the Plaintiff $112,500 in general damages, $35,748 in past and future medical expenses, and $119,998.50 in past and future lost wages. He awarded Kim Johnson, $3,750 for loss of consortium. The trial judge awarded interest from the date of judicial demand.[1]
*148 On appeal, the Defendant asserts eleven errors, contending that the trial judge erred in applying the federal negligence standard in a LHWCA case, in its fact findings, in finding it liable, in denying the Defendant's motion for involuntary dismissal, in failing to find that the Plaintiff was a trespasser on the vessel, and in awarding prejudgment interest on damages for future lost wages and future medical expenses.
The Defendant argues that the Plaintiff is solely responsible for his injuries. It states that the Plaintiff knew that standing on a rope was dangerous because rope tends to roll. It also argues that the Plaintiff should have used a ladder to access the deck of the boat, pursuant to the Louisiana Dock safety policy. Third, it contends that the Plaintiff was not an invitee, and there was no need for him to board the boat at that time because it had to be moved closer to the dock in order for the crane to reach the bow (front end).
The Plaintiff testified that he knew that standing on rope was unsafe because of its tendency to roll. However, he contended that he saw a dangerous situation developing and hurried over to prevent a deckhand from potential injury. The Plaintiff testified that a deckhand was standing under the spot over which the crane suspended the load. The Plaintiff explained that this was dangerous because the brakes sometimes fail on the cranes, which would cause the load to fall. So he hurried over to get the person to move. Instead of telling the deckhand to move when he reached the boat, he told the deckhand to ask Captain Walter Jones where to deposit the button. Since he needed this information anyway, this forced the deckhand to move from the area of danger. The Plaintiff then boarded the tug by stepping from the barge on to the bulwark of the boat. The barge and the tug were almost even where he stepped, so he did not have to climb up or down. He testified that the bulwark was flat along the top and 2 to 3 inches wide. Further toward the front or bow the bulwark slanted upwards. Anywhere forward of where he boarded would have been unsafe to board because of the upward angle and because the bow also flared inward as the angle rose, leaving a gap over the water. The Plaintiff said that, although the surface was flat, it had rope lying along its length. When he stepped on the bulwark and the rope, he reached his hand across the deck to the cabin to balance himself. The distance was approximately 2 to 3 feet. Despite this precaution, the rope slid and he fell to the deck.
The Plaintiff stated that he saw rope on the deck, as well as hanging all over other parts of the bulwark, but that he boarded at that particular spot because it was a safe spot to board. He noted that forward of where he stepped, the flat surface changed to a round half pipe and was at an incline. He could not board from the stern (back) of the boat because a large piece of sheet metal on the 901 was in the way. The Plaintiff stated that he did not board at the bow because cables and lines were strung there. The Plaintiff said that the people that came from the dock to his aid got on the tug the same way he did and no one used a ladder to go from the bulwark to the deck.
The Plaintiff testified that the incident happened very fast, from the time he first saw the deckhand and the danger, to his fall. He insisted that it was his job to unload the button, and for safety reasons, deckhands were not allowed to unhook the load deposited on the tug decks. He stated that he assumed that he had permission to board the vessel because he was doing his job according to instructions from Ochman, *149 who was the foreman in charge of the job.
Ochman and Mel Davis (Davis), the foreman, stated that Louisiana Dock employees had been working on the boat for some time, going on and off, and that they always had permission to board to perform their jobs. In addition, the Captain knew that the Louisiana Dock employees were going to move a button to the boat and he had discussed the matter with the foreman prior to the Plaintiff's attempt to board. Davis noted that the Plaintiff was following orders when he boarded the boat.
Ochman trained the riggers for Louisiana Dock and said that the Plaintiff was a good worker. He stated that Davis gave the instructions on loading the button. He agreed with the Plaintiff that deckhands were not supposed to participate in the rigging operations, according to company policy. However, he disagreed with the Plaintiff that the button was suspended over the bow when the accident happened. Although the witnesses agreed that the crane barge was facing the tug's bow prior to the accident, Ochman thought that the load was hanging over his crane barge. He said that the crane could not reach the tug's bow and he would not suspend it over the bow anyway because people were walking around on the deck. He was waiting for Captain Jones to move the boat forward when the Plaintiff boarded the tug. He did not see the accident because he was looking away at the time. After the accident, he went to the boat and saw the Plaintiff on top of a lot of rope that was snaked back and forth on the deck.
Ochman, Davis, and Ed Roach (Roach), the safety manager, testified to the Louisiana Dock safety policies. No written manual was provided, but weekly safety meetings were held. They testified that the workers are instructed not to step on rope because it can roll or slide. Roach stated that when the Louisiana Dock workers went to aid the Plaintiff, they all stood on the rope that they noticed scattered on the deck. Their actions violated the rope policy as well, but Roach explained that they were all focused on the Plaintiff and his injury. In regard to the use of ladders, the three Louisiana Dock employees testified that there is no blanket policy for using ladders. They stated that ladders are normally used while the repair work is ongoing because the workers are carrying tools and such, or when the distance to the deck from the bulwark is too high to step down. However, Ochman, Davis, and Roach indicated that the workers use their judgment depending on the circumstances. They thought that a ladder was not necessary in this situation because the step down distance from the bulwark to the deck not great, and the loading of the button was the last act Louisiana Dock would be performing for the tug, since the boat was leaving immediately afterwards to pick up its tow. Roach and Ochman also testified that company policy required only the riggers to handle loading and unloading because they are trained to do the job correctly. He stated there are certain ways to hang chain and that the movement of the river affects the balance of the loads.
No one witnessed the accident and no one saw where the Plaintiff actually boarded the boat. The Plaintiff claimed that he stepped on the flat surface of the bulwark and that there was rope on that surface. Captain Jones and Gonzales were skeptical because the flat part of the bulwark is painted with non-skid paint and Gonzales said that he would not have flaked the lines over the flat portion of the bulwark because the non-skid surface could abrade the rope. Captain Jones and Gonzales asserted that the lines would have been *150 flaked on the part of the bulwark that did not have non-skid paint, which was the section with the round half pipe further toward the bow's point. They denied that rope was scattered over the deck.
Gonzales' testimony was contrary to the Plaintiff. He testified that he told the Plaintiff that he could not board without permission from the captain. According to Gonzales, he told the Plaintiff to stay where he was and he went to find the Captain. When he returned, he found the Plaintiff on the deck lying on top of some rope. Gonzales stated that there was no load hanging over him at the time he talked to the Plaintiff. He did not remember that the boat had just returned from sea trials, although the Louisiana Dock employees and Captain Jones so testified. He also did not know that anything was supposed to be loaded at that point and he did not see anything on the crane. Gonzales did not remember anyone from Louisiana Dock coming aboard during the eleven days that he was aboard, although the other testimony showed that they had been working on the tug. Gonzales contended that he laid the excess mooring rope on the bulwarks, as is customary on an ocean going vessel. He described the bow as the best place to board because it had a wide, flat surface bumper attached that gave access to a "second deck", a grate, which in turn gave access to a short step to the deck. However, the distance from the bulwark to the deck in this section was approximately five feet and the grate or second deck could not be seen from the dock. He confirmed the Plaintiff's description of the tug's hull, stating that the bow would have been farther away from the dock than the middle of the boat.
Captain Jones testified that the tug is 100 feet long and 27½ wide and is used to both push barges in the river and to pull barges in the ocean. At the bow point, a 12 inch steel structure is attached that wraps around the bow. This is covered by a rubber fender, 14 to 16 feet wide, designed to take the impact of pushing barges. He testified that the round half pipe is welded on the bulwark 1 to 1½ feet behind the "quarter bit" (the welded object used for working the lines which is located approximately ¼ of the way around the hull). The round half pipe is designed to allow the lines to slide freely. Captain Jones stated that after the boat is tied up, the excess line can be coiled, or it can be flaked on the deck and pushed up against the waste (bulwark). It can also be flaked on the bulwark, flipped back and forth over bulwark with loops alternating on the deck side and the outside of the hull. He stated the boat was not moving when the accident occurred. He was having trouble with an engine. He agreed with Ochman that the boom of the crane was 30 to 40 feet short of the bow. He said that the button was down on the crane barge at the time. Prior to the accident, Captain Jones had been ashore talking to the crane operator. When he boarded, Gonzales told him that someone wanted to talk to him about the crane. Captain Jones said he had already discussed the matter with the crane operator. When Gonzales went back to relay this message, he found the injured Plaintiff. Captain Jones insisted that the rope on the deck by the Plaintiff came off of the bulwark when he fell. Captain Jones claimed that he put the rope the others saw under the Plaintiff because the deck was hot from the sun. However, Davis, Ochman and Roach stated that there was a lot of rope under the Plaintiff when they saw him on the deck. Roach said that rope was scattered everywhere.
DUTY UNDER THE LHWCA
The LHWCA, 33 U.S.C. § 905(b) provides a cause of action by a longshoreman *151 against a vessel on which he was injured.[2] The vessel's liability is based on the general maritime law of negligence. The duties owed by the vessel to the longshoreman were set out in Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Under Scindia, before turning over the ship to the stevedore, the owner has a duty to warn the longshoremen of hidden defects that would be known to the ship owner in the exercise of reasonable care and he must exercise care to deliver to the stevedore a safe ship with respect to gear, equipment, tools, and work space. Second, the ship owner has a duty to avoid exposing the longshoremen to harm from hazards under the act or control of the vessel. Third, even though the owner is generally relieved of responsibility for accidents which occur once the unloading process has begun, it has a duty to intervene in the stevedoring process if it knows that a hazard exists that presents an unreasonable risk of harm to the longshoremen, and to eliminate or neutralize the hazard. Id. 101 S.Ct. at 1626. Helaire v. Mobil Oil Co., 709 F.2d 1031, 1036 (5th Cir.1983).
DENIAL OF MOTION FOR INVOLUNTARY DISMISSAL
First, we find no error in the trial judge's rejection of the Defendant's argument that the Plaintiff should have used a ladder and in the contention that the Plaintiff was a trespasser. The Plaintiff proved by a preponderance of the evidence in his case in chief that a ladder would not have prevented this accident, or that one was necessary in this situation. In addition, the Plaintiff's witnesses testified that the workers had permission to board the tug. This was later supported by Captain Jones' testimony.
Next, during presentation of the Plaintiff's case, he testified that he entered on the flat section of the tug, that the reason he did so was because it was even with the barge and appeared to be the safest way to board considering the shape of the tug, and the obstacles to the rear (the metal object on the 901) and on the bow (various cables and lines). He testified that in the rush to prevent an accident to the deckhand, he used poor judgment in stepping on a section of bulwark with rope lying on it. No one saw the Plaintiff when he jumped on the boat. The trial judge chose to believe the Plaintiff's version of the events, although he and the crane operator differed on where the crane was located. This was a credibility decision. The evidence also showed that standing or walking on a rope is unsafe because it can roll from under the person's feet. The Louisiana Dock employees all saw a lot of rope on the deck when they arrived. They testified that the Plaintiff was lying or sitting on the rope in pain. Thus, at the end of the Plaintiff's case, he established that the Plaintiff thought that there was an emergency and was hurrying to prevent an accident, that he entered the boat where he thought it was safest and the logical place to board, and that the logical spot was covered with rope, setting up a hazardous situation to invitees. Thus, we find *152 that the trial judge was justified in denying the motion for involuntary dismissal.
NEGLIGENCE
The Defendant's evidence was that the lines were flaked by Gonzales, who said he pushed the lines so that they laid flat covering the slippery part of the bulwark. If the Plaintiff boarded there, as the trial judge seemed to conclude at the end of the trial, the Plaintiff would not have seen the smooth, slippery surface, only the flattened rope. While aware of the danger of standing on rope, he would not have been aware that the danger was substantially increased by the slippery surface. However, if the Plaintiff stepped on a flat surface, then the lines were flaked over the section with non-skid paint on it, thus creating a boarding hazard. In either event, the Defendant created a hazard in an area under its active control that contributed significantly to the accident. Unlike Scindia, the Plaintiff here was on his way to conduct his rigging activities when he was injured. He was not injured due to any act or defect created by Louisiana Dock. This case is also distinguishable because he was rushing to prevent an injury to the Defendant's deckhand who was not paying attention to his surroundings. Under these facts, we find that the Defendant breached a duty to the Plaintiff and that the breach was a significant cause of the accident. Thus, we find that the trial judge did not err in his factual findings, in his legal analysis, in denying the Defendant's motion for involuntary dismissal, or in assessing 75% of the fault to the Defendant.
PREJUDGMENT INTEREST
The trial judge erred in awarding prejudgment interest on future medicals and lost wages. Generally, the courts have the discretion to award prejudgment interest in cases based on admiralty jurisdiction. Mislead v. v. Diamond M. Offshore, Inc., 95-2446, p. 14 (La.7/2/96), 676 So.2d 89, 97. In addition, the LHWCA does not prohibit the award of prejudgment interest. Guidry v. Booker Drilling Co., 901 F.2d 485 (5th Cir.1990). Thus, the trial judge did not err in awarding prejudgment interest, and the Defendant does not contest that award. However, prejudgment interest on awards for future losses are not recoverable in cases under admiralty jurisdiction. Milstead, 95-2446 at 15, 676 So.2d at 97.
The trial judge did not divide the medical expenses and lost wages into past and future damages. In Milstead, a similar circumstance occurred and the Court remanded the case solely for a division of those damages by the trial judge. Following Milstead, we will remand the matter for the trial judge to separate the past and future medical expenses and lost wages. We will affirm the award of prejudgment interest on the past medical expenses and lost wages.
Accordingly, the judgment of the trial court is hereby affirmed as to liability, and damages. We affirm the award for legal interest from date of judicial demand as to the past general damages, medical expenses and past lost wages and vacate as to future medicals and lost wages. We remand the case for the trial judge to separate the past and future lost wages and medical expenses. Cost of appeal are assessed against Defendant.
AFFIRMED IN PART, VACATED IN PART AND REMANDED.
NOTES
[1] The intervenor, Louisiana Dock, was awarded $40,980.67 from the date of judicial demand.
[2] "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred." 33 U.S.C. § 905(b).