MAX N. TOBIAS, JR., Judge.
|,The appellants, Donnie Viator (“Via-tor”) and his wife, April, appeal the trial court’s granting of summary judgment in favor of the appellee, LeBeouf Bros. Towing, L.L.C. (“LeBeouf’), dismissing the totality of their claims, with prejudice, on the basis that LeBeouf owed no duty to Viator for the injury that befell him. Finding genuine issues of material fact remain precluding summary judgment, we reverse the trial court’s judgment and remand the case for further proceedings.
Viator, a longshoreman employed by Plains All American GP, L.L.C. (“Plains”), allegedly injured his back on 2 August 2008 when he picked up a crossover hose[1] while aboard a tank barge owned by Le-Beouf and afloat in the Mississippi River at the Plains dock facility located in Venice, Louisiana. Following his injury, Plains, through its longshore carrier, paid Viator compensation benefits pursuant to the Longshore and Harbor Workers’ Compensation Act (“LHWCA”). Thereafter, Viator and his wife filed suit against the vessel owner, LeBeouf, seeking damages pursuant to 33 U.S.C. § 905(b) of the LHWCA for its alleged negligence. Le-Beouf moved for summary judgment on the |2basis that it breached no duty owed to Viator. The trial court granted Le-Beouf s motion and Viator timely appealed.

Factual Background

On the day of the incident, Viator was on duty as a station operator at the Plains dock when LeBeoufs vessel, the MW CREOLE SPIRIT, arrived pushing two barges, the GONSOULIN 303 (“barge G303”) and GONSOULIN 304 (“barge G304”), for purposes of loading a petroleum product. As Plains’ station operator, Viator was responsible for gauging the LeBeouf barges following the completion of the product transfer, and for procuring samples of the petroleum product from those tanks.[2]
Loading began soon after the CREOLE SPIRIT docked. In order to load the petroleum product onto the LeBeouf barges, a hose was connected from the shore to the G303, which was situated closest to the Plains’ dock, and then a second crossover hose was attached from barge G303 to barge G304; the barges were secured alongside each another. An approximate 2-to-3 inch gap existed between the barges, but they were close enough to each other that water could not be seen through the gap. Once the product transfer was completed, Viator shut down the pumps transferring the petroleum product and boarded barge G303 in order to conduct his gauging duties. While he was doing so, two of the vessel’s crew members on board the deck of the adjacent barge G304 were engaged in disconnecting the |,.¡crossover hose that connected barges G303 and G304.[3] Viator, still aboard barge G303 gauging its tank, heard a holler and the sound of the crossover hose hitting barge G304’s deck. He turned towards the direction of the noise and saw that the two LeBeouf deckhands, Johnathan Poché (“Poché”) and Clifford Simmons (“Simmons”), had both fallen onto the deck of *231 barge G304 and that the crossover hose, having been dropped, was laying outside the drip pan leaking residual oil onto the deck. He also noticed a sheen of oil on the river. Viator immediately disembarked barge G303, boarded barge G304, and lifted up the crossover hose and placed it into barge G304’s drip pan. Viator contends he was injured in the process of lifting the hose.
Viator testified by deposition that his job responsibilities as a station operator on the date of the incident were limited to operating the land-based valves for the loading operation, gauging the tanks of barges G303 and G304 before and after the loading process, and procuring samples of the petroleum product. Both barges were owned by LeBeouf and it was his job as Plains’ station operator to gauge both; he worked on both barges and had authority to be aboard both barges. Viator further testified that it was the responsibility of the vessel’s tankerman to connect and disconnect the crossover hose. Viator acknowledged that he was not trained to handle crossover hoses and that, prior to the date of the incident, he had never handled a crossover hose. He also conceded that he was neither authorized nor instructed to handle the barge’s crossover hose on the date of the accident.[4] According to Viator, however, even though no one was calling for him to come over and help, he heard the deckhands yelling, saw the crossover hose dripping oil [ 4onto the deck and into the river, and it was clear to him the deckhands had fallen onto the deck. So even though it wasn’t his job to handle the crossover hose, he explained that he perceived an emergency situation involving a hazardous condition, and in order to prevent further damage to property and or persons, responded by stepping over to barge G304, picking up the dripping hose, and placing it into the drip pan.
Donald Cheramie (“Cheramie”), employed by LeBeouf and serving as the captain of the CREOLE SPIRIT at the time of the incident, testified by deposition and affidavit stating that disconnecting the crossover hose is the sole responsibility of the barge’s tankerman, who is routinely assisted by other members of the vessel’s crew.[5] Cheramie stated that disconnecting the crossover hose is generally a three-person job and requires the assistance of the tankerman. On this occasion, however, barge G304’s tankerman, Alan Chil-dress (“Childress”), was busy assisting barge G303’s tankerman, Jackie Danos (“Danos”),[6] in disconnecting the hose con *232 necting barge G303 to the dock, and, thus, was unavailable to help disconnect the crossover hose connecting barges G303 and G304. According to Cheramie, unbeknownst to Childress, LeBeoufs deckhands, Poché and Simmons, took it upon themselves to complete the task alone. Cheramie further explained that the crossover hose has to be drained of any residual product before being ^disconnected. To prevent the crossover hose from falling onto the deck or overboard, and to assist in draining the residual product, LeBeoufs crew members typically use a winch that is fixed-in-place on the deck of barge G304 in order to lift and secure the hose. Alternatively, they would secure the hose with a rope and manually lift it. Cheramie testified that, on this occasion, however, the winch on the barge had been “frozen,” or would not turn, for approximately a week, and thus, was inoperable. Therefore, the hose had to be manually lifted during the connection and disconnection process.
LeBeoufs deckhand, Poché, also testified by deposition. Poché testified that the task of connecting and disconnecting the hoses is the responsibility of a licensed tankerman; the deckhand is there to assist. Nonetheless, he claims that in this instance, LeBeoufs tankerman, Childress, directed him to complete the task of disconnecting the crossover hose. Poché explained that he and Simmons used a tag line, attached it to the crossover hose, but instead of tying the tag line off at a secure point or hooking it to the winch, Simmons continued to hold the tag line. After wrapping it a few times around a boom, he pulled the line tight in order to keep it in place over the drip pan while Poché | (¡loosened the bolts attaching the hose to the deck. He testified that they did not secure the hose with the winch because the winch had been “frozen” for about a week and was inoperable. Poché testified that, normally, after the loading has been completed, any residual product remaining in the hose is pumped out prior to the crossover hose being disconnected. On this occasion, the residual product had not been completely drained causing the crossover hose to be very heavy. Therefore, when Poché loosened the last bolt, he and Simmons lost control of the hose and it fell onto the deck. The residual oil remaining in the hose spilled out onto the deck. Poché contends that his leg got caught underneath the hose, and once he freed himself from it, he tried to pick the hose up by himself but he slipped on the oil and fell onto the deck. Viator came on board and helped him put the hose into the drip pan.
Excerpts from the deposition of Simmons, the LeBeouf deckhand assisting Poché, are also contained in the record. According to Simmons, on the day of the incident, when he came on shift, LeBeoufs tankerman and the Fryoux Tankerman Service, Inc.’s tankerman[7] were disconnecting the dock hose. He saw that Poché had begun the process of disconnecting the crossover hose, so he went over to assist him. No one specifically instructed him to do that. In order to disconnect the crossover hose, they tied a rope around the winch, which was approximately one to two feet overhead, and then attached the rope to the hose, lifted the hose up, and began loosening the bolts. When Poché was re *233 moving the last bolt, given the heavy weight of the hose, they lost control of it and the hose fell and product spilled out onto the deck.

Assignments of Error

The sole issue presented for review is whether the trial court erred in its determination that the owner of the vessel, Le-Beouf, owed no duty to Viator, a longshoreman, for the injury that befell him when he responded to an emergency situation caused by a hazardous condition created by LeBeouf s negligence.

17Standard of Review

Appellate courts review a grant of summary judgment de novo using the same criteria applied by the lower court to determine if summary judgment is appropriate. Schroeder v. Board of Supervisors, 591 So.2d 842 (La.1991). Summary judgment shall be granted “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La. C.C.P. art. 966(B).

Discussion

Viator’s claim, filed in state court pursuant to the savings to suitors clause seeking recovery under 33 U.S.C. § 905(b) of the LHWCA, falls within maritime jurisdiction. Giorgio v. Alliance Operating Corp., 05-0002, p. 10 (La.1/19/06), 921 So.2d 58, 67. As such, his claim is governed by substantive maritime law. See Green v. Industrial Helicopters, Inc., 593 So.2d 634, 637-638 (La.1992); Milstead v. Diamond M. Offshore, Inc., 95-2446, p. 7 (La.7/2/96), 676 So.2d 89, 94. The statute, 33 U.S.C. § 905(b), gives a longshore worker the right to file a third party suit against a shipowner for personal injuries sustained during cargo operations aboard the owner’s vessel.[8] Clay v. Daiichi Shipping, 74 F.Supp.2d 665, 668 (E.D.La.1999). In order to establish vessel negligence, the longshore worker must prove that the vessel owner violated or breached a duty owed to him. Scindia Steam Navigation Co., Ltd. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); Poole v. Quality Shipyards, Inc., 95-1331, pp. 3-4 (La.App. 4 Cir. 1/19/96), 668 So.2d 411, 413.
It is well-established that the owner of a ship is entitled to “rely on the stevedore to avoid exposing the longshoreman to unreasonable hazards.” Scindia, 451 U.S. at 170, 101 S.Ct. 1614. Pursuant to the LHWCA, the stevedore must provide a “reasonably safe” workplace and to use certain safeguards to protect the health and safety of the longshoremen. See 33 U.S.C. § 941(a); see also Hewlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 101, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994); Scindia, 451 U.S. at 170, 101 S.Ct. 1614. Indeed, the stevedore is “in the best position to avoid accidents during cargo operations.” Scindia, 451 U.S. at 171, 101 S.Ct. *234 1614; see also Howlett, 512 U.S. at 101, 114 S.Ct. 2057.
The United States Supreme Court set forth the scope of the shipowner’s duty under § 905(b) with respect to longshoremen as consisting of three aspects: (1) the turnover duty (comprised of the duty to provide safe conditions and a duty to warn); (2) the active operations/active participation duty; and (3) the duty to intervene. See Scindia, 451 U.S. at 167-78, 101 S.Ct. 1614;, Howlett, 512 U.S. at 98, 114 S.Ct. 2057. If the vessel, through its crew, breaches any one of these duties and that breach causes injury to |9a longshoreman, the longshoreman may recover from the vessel under the LHWCA.
The “turnover duty” concerns the condition of the vessel at the time it is turned over for stevedoring operations. See Howlett, 512 U.S. at 98, 114 S.Ct. 2057. The “active operations duty,” applicable once stevedoring operations have begun, is violated if the vessel owner “actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoreman to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.” Scindia, 451 U.S. at 167, 101 S.Ct. 1614; see also Howlett, 512 U.S. at 98, 114 S.Ct. 2057 (emphasis added). The duty to intervene “concerns the vessel’s obligations to intervene with regard to cargo operations in areas under the principal control of the independent stevedore.” Howlett, 512 U.S. at 98, 114 S.Ct. 2057.
In the present case, LeBeouf contends that no genuine issue of material fact exists that gives rise to a Seindia duty in favor of Viator. Specifically, it claims that it owed no duty to protect Viator from being injured by the crossover hose because the undisputed evidence establishes that disconnecting the hose was a task outside the scope of Viator’s duties as a station operator. Moreover, LeBeouf contends that under Section 905(b), no absolute duty to provide a totally safe work place is owed; all that is owed is a reasonably safe work place for Viator to perform his responsibilities as a longshoreman. In the instant case, Viator was performing a job to which he was neither assigned nor authorized, and the |incrossover hose was on a wholly separate barge from which Viator was performing his gauging work. Thus, according to LeBeouf, it did provide Viator with a safe place to conduct his gauging activities, which was the only duty it owed to him. Further, because Viator was performing work outside the scope of his gauging activities when he went to assist the deckhands in placing the crossover hose into the drip pan, there was no way for LeBeouf to protect him. Finally, LeBeouf contends the undisputed facts establish that no emergency situation existed.
Viator argues that both barges were owned by LeBeouf and were situated directly alongside one another. It was his job to gauge both barges and he had authority to be aboard both barges in order to conduct his gauging activities. While completing the gauging activities on the barges, Viator contends that a hazardous condition was created by LeBeouf s negligence in engaging two unlicensed deckhands (instead of a licensed tankerman) to disconnect the crossover hose and by failing to completely drain the hose and properly tie it off before being disconnected. Because of LeBeouf s negligence, the two deckhands dropped the heavily laden hose, they fell to the deck, and oil spilled out onto the deck and into the water. Viator argues that, in his mind, this created an emergency situation (i e., seeing oil on the deck and believing there to be oil in the *235 water; deckhands fallen, hollering and possibly injured; and, a wayward hose continuing to discharge product), to which he reasonably responded by crossing over onto the barge, picking up the hose, and placing it into the drip pan to prevent further spillage or injury. Viator further argues that LeBeouf s duty to provide him a reasonably safe Nwork place to conduct his gauging activities included preventing an emergency situation from occurring that would require his immediate response.
In support of his position that the ambit of LeBeouf s Scindia duties encompass the emergency situation presented in the instant case, Viator relies on Johnson v. Louisiana Dock Company, L.L.C., 03-39 (La.App. 5 Cir. 4/29/03), 846 So.2d 145. In Johnson, the plaintiff was working as a longshoreman assisting in the transfer of a load by crane onto a vessel when he saw that a deckhand was standing directly beneath the load. In an effort to avoid possible injury in the event the load were to fall, the plaintiff boarded the vessel by stepping onto a rope-covered wet bulwark, slipped on the rope, fell, and sustained injury. At trial, the plaintiff testified that he knew standing on a rope was unsafe due to its tendency to roll, but he boarded the vessel at the most logical point under the circumstances to respond to the emergency situation. The vessel owner argued that it had breached no Scindia duty to the plaintiff because he had exceeded his job duties when he unnecessarily boarded the vessel and sustained injury. Following a trial on the merits, the trial court disagreed. Specifically, it determined that the vessel owner’s negligence in creating a hazard in an area under its control by leaving the ropes on the bulwark, even though the bulwark was not the standard point to board the vessel, breached a duty it owed to the plaintiff, a longshoreman, even though the longshoreman was rushing to prevent an injury and not boarding the vessel to perform his assigned duties.
| ^LeBeouf distinguishes Johnson from the instant case on the basis that Johnson, a rigger, was injured in the course and scope of the movement of a load by the crane. Working directly with the crane was within the scope of the services Johnson rendered as a rigger. As a result of seeing a situation involving an issue with hooking a line to the crane, an injury occurred. According to LeBeouf, the Johnson court extended the Scindia test to encompass a duty owed to Johnson solely on the basis that part of his job duties as a rigger included the actions Johnson took at the time of his injury; ie., riggers almost always work with loads off of cranes or movement of loads, and the emergency situation to which Johnson responded involved a crane and the movement of a load. Consequently, LeBeouf argues — and the trial judge.agreed — that in the instant case, Johnson does not apply to extend the Scindia duties to Viator because Viator was working on a wholly different barge and, unlike Johnson, nothing he did at the time of his injury, ie., lifting the crossover hose, was a part of his job as a station operator.
We find the trial court erred in its narrow reading of Johnson as a basis for granting summary judgment in this case. First, Johnson was decided after a full trial on the merits, not on a motion for summary judgment. Second, we do not read Johnson as authority for limiting a vessel owner’s liability to a longshoreman who is injured in the course of responding to an emergency created by the negligence of the vessel owner solely to those situations where the injury to the longshoreman occurs while he is actually performing a duty to which he is assigned. Instead, we find that the Johnson court found liability on the basis that the vessel owner *236 | ]abreached its Scindia duty owed to Johnson when it created a hazard in an area of the vessel under its active control that contributed significantly to the accident and Johnson’s injury.
Our d,e novo review of the record in the instant case leads us to conclude that a genuine issue of fact remains as to whether LeBeouf breached its “active control” duty. The active control duty “recognizes that although a vessel owner no longer retains the primary responsibility for safety in a work area turned over to [the stevedore], no cession results as relates to equipment over which the vessel’s crew retains operational control.” Manuel v. Cameron Offshore Boats, Inc., 103 F.3d 31, 34 (5th Cir.1997). Moreover, the shipowner owes a duty to “exercise due care to avoid exposing longshoremen to harm from hazards they may encounter ... from [such] equipment.” Pimental v. LTD Canadian Pacific Bul, 965 F.2d 13, 16 (5th Cir.1992). From the testimony given in this case, we find that a jury could conclude that (1) the vessel’s crew had operational control of the crossover hose on barge G304 at the time of Viator’s accident, (2) the vessel’s crew created a hazardous condition when it failed to use due care in disconnecting the crossover hose by failing to provide an operable winch, an adequate crew, and a tankerman to supervise and/or assist in the disconnection process, (3) the deckhands’ dropping of the crossover hose onto the deck resulting in residual oil spilling onto the deck and into the water, and the deckhands falling onto the deck, created an emergency situation, (4) the stevedore operations were not complete on barge G304 at the time of the incident and that Viator had permission to board barge G304 in order to Incomplete his gauging activities, (5) Viator’s alleged injury was not due to any act or defect created by Plains, and (6) a reasonable longshoreman with permission to board the barge where an emergency situation exists in order to complete his job responsibilities would have responded by going to the aid of the crewmen and lifting the hose over the drip pain to prevent further damage to person and/or property. Consequently, we find LeBeouf has failed to establish the absence of factual issues regarding the question of its negligence.

Conclusion

For the reasons stated, we conclude that genuine issues of material fact exist precluding summary judgment in this case. Accordingly, the judgment appealed from is reversed and the matter is remanded to the trial court for further proceedings.

REVERSED AND REMANDED.

. Crossover hoses are commonly used during oil cargo transfer operations to connect two barges to allow for the loading or discharge of a product.

. Viator testified that his job duties as a station operator for Plains consisted of gauging tanks, taking samples, general maintenance, proving meters, cutting tickets, and custody transfer of the product to barges; they did not include the handling of crossover hoses. According to Viator, he neither had experience nor had he ever handled a crossover hose.

. At no time was Viator considered a member of the barge’s crew; the barge had its own crew from the tug that pushed her.

. The affidavit of Rusty J. Cavalier, Belle Chase District Manager for Plains, attests that (1) Viator had no authority from Plains to handle the barges' crossover hose during loading operations; (2) Plains had no knowledge that Viator would ever have occasion to handle a crossover hose while performing his gauging activities on the G303 and the G304; and (3) handling a barge’s crossover hose was outside the scope of Viator’s job duties with Plains at its Venice facility.

. During the cargo transfer process, the tank-ermen are required to remain on the barges upon which they are the designated person-in-charge ("PIC”). Federal rules and regulations require that an oil supplier have a PIC on its dock and that each tank barge has a tankerman-PIC to supervise product loading on that barge. See 33 C.F.R. § 154.710 (person in charge of facility); 46 C.F.R. § 15.860 (tankerman); 33 C.F.R. § 156.115 (person in charge; limitations); 33 C.F.R. § 156.120 (requirements for liquid cargo transfer). At the time of Viator's alleged injury, he was the PIC of Plains’ dock, Danos was the tankerman-PIC of barge G303, and Alan Childress was the tankerman-PIC of barge G304.

.Childress was employed by LeBeouf. On this occasion, LeBeouf went through Fryoux Tankerman Service, Inc. ("Fryoux”), and contracted an independent tankerman from Fiyoux, Danos, to serve as tankerman-PIC for barge G303.

. Fryoux's tankerman-PIC on barge G303, Danos, also testified by deposition. Excerpts from his deposition are contained in the record. Danos testified that he was in the process of disconnecting the dock hose with the assistance of Childress, tankerman for barge 0304, when he heard some guys hollering and the sound of a hose hitting the deck. He did not witness what happened because his back was to the barge at that time, nor could he turn around to see due to his involvement with disconnecting the dock hose.

. 33 U.S.C. § 905(b) provides in relevant part:
"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide ste-vedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel.” Accordingly, a vessel can only be liable for
its own negligence. See Walker v. Blacksea S.S. Co., 637 F.2d 287, 288-89 (5th Cir.1981).